JOHN GABRIEL, MILTON WOLLMAN AND MICHAEL ESPOSITO, TRADING AS ALLIED SECURITIES CO., PLAINTIFFS-APPELLANTS, v. THE BOROUGH OF PARAMUS, A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

Argued March 15, 1965—Decided July 9, 1965.

*Mr. Robert K. Hartmann* argued the cause for appellants.

*Mr. Thomas S. O'Brien* argued the cause for respondent.

The opinion of the court was delivered by
SCHETTINO, J. Plaintiffs, owners of two parcels of land in the Borough of Paramus, were assessed $18,568.70 as the

benefit to plaintiffs from defendant's local sewer system improvement. The dollar amount of the assessment was stipulated to be in proportion to and not in excess of the alleged benefits. At trial it was stipulated that all of the statutory procedures in adopting the improvement ordinance and in making the assessments had been complied with. Plaintiffs objected to the assessments, however, alleging that no benefit to their property resulted from the improvement. The assessment was confirmed by defendant's governing body, and on appeal, the decision was affirmed by the Superior Court, Law Division. Plaintiffs appealed to the Appellate Division and we certified the cause before argument.

Many issues were set forth in the pleadings and pretrial order—all were disposed of by stipulation except one. That issue is: May the municipality assess property for a local improvement when plaintiffs' direct benefit results from an interceptor sewer line (which tied into and is the sole outlet of the municipality's sewer system) built and paid for by the county sewer authority as a result of a contract between the defendant municipality and the sewer authority?

■ The authority or power to make public improvements does not of itself confer power to levy assessments to pay for the improvements; such power must be conferred by constitution, statute or charter. 14 *McQuillin, Municipal Corporations* § 38.07 (*3d ed.* 1950). The Home Rule Act of 1917 is the principal source of a municipality's authority to undertake local improvements and to pay for them by assessment. See *Burstiner v. City of East Orange,* 100 *N. J. L.* 385 (*E. & A.* 1925).

We note that historically all public improvements originally were made at the expense of the taxpayers generally. However, in 1427, Parliament provided for the draining of certain marshes at the expense of a more limited class, namely, the property owners benefiting thereby. 6 *Hen.* 6, *c.* 5, § 6. This theory was widely adopted in this country. *State, Society, etc., pros. v. City of Paterson,* 42 *N. J. L.* 615 (*E. & A.* 1880); *Hamilton, Special Assessments, p. 4 et seq.* (1907).

Our Legislature has provided that a municipality has the option of undertaking public improvements at the expense of the land benefited thereby or at the expense of the municipality generally. *N. J. S. A.* 40:56–1.

Although a public improvement may be of general benefit to the municipality at large, it does not negate the existence of special benefits to individual properties. *Leggett v. Plainfield,* 97 *N. J. L.* 341 (*E. & A.* 1921). For a special assessment to be levied it is enough that the land be in the vicinity of the local improvement and be benefited thereby. *N. J. S. A.* 40:56–1. The foundation of the power to levy a special assessment is the benefit or enhancement of value which the improvement confers. *Cirasella v. Village of South Orange,* 57 *N. J. Super.* 522, 528 (*App. Div.* 1959); *In re Public Service Electric and Gas Co.,* 18 *N. J. Super.* 357 (*App. Div.* 1952). See also *Jardine v. Borough of Rumson,* 30 *N. J. Super.* 509 (*App. Div.* 1954); *Sahl v. West Deptford Tp.,* 32 *N. J. Super.* 546 (*App. Div.* 1954).

In *Hills v. City of Rahway,* 29 *N. J. Super.* 16 (*App. Div.* 1953), the city assessed as a local improvement the cost of construction of extensions to its sanitary sewerage system. The owners of the land in question built, at their own expense, lateral sewers which connected with and emptied into the trunk sewer constructed by the city. The court found that the owners were actually being served by the trunk sewer and to that extent were benefited, stating (at *p.* 23):

> "Lands served by a sewage system constructed by a city, although not on the line of the sewer or of the street through which the sewer runs, if benefited, are subject to assessment * * * [citations omitted]. And this is true of lands served by lateral sewers, not fronting on the main or trunk sewer, where such lateral sewers empty into the main sewer."

*Hills* referred to *River Edge Homes, Inc. v. Borough of River Edge,* 130 *N. J. L.* 376 (*Sup. Ct.* 1943), wherein assessments made for the extension of the existing sewer system were at issue. Although the owner had to erect a lateral sewer

and a pumping station in order to use the new extensions, the court upheld the assessment stating (at *p*. 381) : "The lands are benefited. The sewage is carried off by the trunk sewer and the lands thus served commensurately increased in value."

In *In re Hazeltine*, 23 *N. J. Super*. 154 (*Law Div*. 1952), the municipality enlarged an existing drainage outlet. Part of the cost thereof was assessed to lands not directly connected to the laterals and trunk lines of the improvement. The court made the following finding as to whether a benefit had been conferred (at *p*. 160).

"It is the finding of this court that where laterals and trunks have been constructed, which have in part taken over the drainage afforded by the Crooked Brook, as here, and a new outlet constructed in part, property holders whose drainage is carried or *facilitated* by the drainage system, as here, receive a special or peculiar benefit by reason of the furnishing of a new, enlarged outlet made necessary by the improvements accelerating the descent of the storm water thereby surcharging the main trunks laid in place of the brook, there being no question that this improvement increased the discharge of water beyond the natural capacity of Crooked Brook." (Emphasis ours)

We conclude therefore that land, although not abutting the improvement itself and therefore necessitating a private connection thereto, can be assessd for the proportionate share of the cost of the total improvement.

We turn to the history of the case. The facts are not disputed. The Bergen County Freeholders in 1947 created the Bergen County Sewer Authority under *N. J. S. A*. 40 :36A–2. The Authority has the power to contract with municipalities within the county (*N. J. S. A*. 40 :36A–33) for the disposal of sewage through a District Sewer System.

In 1957 the Borough of Paramus adopted an ordinance authorizing a contract with the Authority for the disposal of sewage emanating from the Borough. The contract in general provided that the Authority would dispose of the sewage collected by a proposed municipal sewer system to be built by the Borough for a charge to the Borough depending on the metered flow of sewage out of the municipal system into the

County District System. It also provided that the Borough would not execute the contract until the Authority agreed on a point of connection located in Paramus between the proposed municipal system and the district system. Subsequent negotiations found it would be more economical to change the original site chosen for the connection and as a result of this change, an interceptor sewer line was constructed and paid for by the Authority at a cost of $300,000. The Authority acquired by condemnation an easement across plaintiffs' property and it was through this easement that the interceptor was built.

In 1960, the Borough adopted Ordinance 412 which provided for the construction of Stage I of the municipal sewage system, the system contemplated in 1957, which would tie into the District Sewer System. Section 1 stated that the improvement described in section 3 was authorized as a local improvement. This part of the system was constructed at the cost of $3,330,000 and was tied into the interceptor. All the sewage from the Borough's sewer system flows through the interceptor into the district sewer system. At the district end of the interceptor is a meter which measures the amount of sewage and is the basis for the Authority's annual charge to the Borough.

The ordinance provided that the Borough would issue notes in its name to finance part of the construction and also directed a special assessment to pay for the remainder. The special assessment was levied pursuant to *N. J. S. A.* 40 :56–1 which defines a local improvement as one, "the cost of which, or a portion thereof, may be assessed upon the lands in the vicinity thereof benefited thereby." *Par.* (i) of the statute gives a municipality the power to construct sewers as a local improvement.

The consulting engineer engaged by the Borough to negotiate with the Authority, testified that at the insistence of the Borough, opening facilities were installed in the interceptor so that various properties, including that of plaintiffs, would be able to connect directly to the interceptor. However, any

such connection could only be made in accordance with an understanding between the Borough and the Authority that the property owners who wanted to make such a connection had to apply to the Authority for permission and were required to obtain an endorsement of approval on the permit by the Borough's board of health.

Plaintiffs' lots are located near the intersection of Route 4 and Forest Avenue in the Borough of Paramus. The sewer installations provided for in Ordinance 412 come near plaintiffs' property, but are not accessible. The section of the Paramus sewer on Route 4 cannot be used by plaintiffs since neither lot fronts on Route 4, and properties owned by others are in between. The sewer on the west side of Forest Avenue is of no use to the plaintiffs because the elevation of their property makes a tie-in to this sewer impossible without pumps. As for the Paramus sewer on the east side of Forest Avenue on which plaintiffs' property fronts, the elevation differential exists and moreover a tie-in is impossible as the sewer line stops short of plaintiffs' property. But see *River Edge Homes, Inc., supra.*

Plaintiffs, at their own expense and with the written permission of the Authority and approval by the Borough's board of health, built their own private sewer line connecting with and into the interceptor sewer.

Plaintiffs contended at trial and before us that even conceding that their private line connection to the interceptor sewer benefits their property, the Borough cannot assess their property for a local improvement for "this fortunate consequence." The Borough does not dispute the fact that none of the municipal installations permits a tie-in to plaintiffs' property but contends however, that the alleged benefit arises from the fact that plaintiffs have connected directly to the Authority's interceptor which would not have been available had it not been for the Paramus sewer system of which the Authority's interceptor line was a necessary, actual and integral part; that the Authority's interceptor and the Paramus sewer system are "one and the same [sewerage] system" in that the

"interceptor and all connections thereto were installed by the Authority as part of its contract with the Borough to provide sewer service for all of the properties" and that "plaintiffs are not entitled to the benefit of the bargain made by the defendant in its contract with the Authority" and that as plaintiffs are benefiting from the improvement as their neighbors are, they should be forced to pay their fair share.

The trial court agreed with the Borough stating:

"* * * from a practical standpoint the sewerage system of Paramus consists of what Paramus did as a local improvement in the construction of trunks and laterals, and what the Bergen County Sewer Authority did in the construction of this 8,000-foot Interceptor sewer designed and put in by the Authority for the purpose of Paramus connecting to it."

It concluded that as plaintiffs' land was in the vicinity of the sewer system and was benefited by the connection to it, the assessment was proper.

We agree with the trial court's findings and determinations. The Borough's plan for collecting and disposing of sewage was of one piece, *i. e.*, to provide for a system which would service all properties located in Stage I. The Borough meticulously considered how best — practically and financially — it could set up such a system including a connection to the Authority's trunk line located on Route 4 at the boundary line of Paramus. The interceptor approach was the second and final one. Concededly this line was installed solely as the result of the Paramus sewer system and would not have come into being except for such system.

Although the interceptor line was built and paid for by the Authority, the Borough maintained substantial control over it: The Borough insisted that the Authority permit connections in the interceptor line to service properties. Moreover, in order for a property to be serviced by this interceptor line, although a permit had to be obtained from the Authority, it could only be effective if approved by the Borough's board of health. Such procedures have been followed, permits have been granted and connections made—including plaintiffs' con-

nection. Thus, we find, in its concept and in its operation the Borough and the Authority have considered the interceptor line as an integral part of the Borough's sewer system.

Additionally, plaintiffs have at least inferentially acknowledged the concept of an integrated system. Plaintiffs admit that they pay such annual sewer service charges to the Borough, as do the other users of the Paramus Sanitary Sewerage System. The meter rates are established by the Authority and paid by the Borough. But the Borough establishes its own rates and charges which include not only the rates paid to the Authority, but also the Borough's operating and maintenance expenses and debt service. These charges apply to all properties connected to and served by the system.

In passing we note that the Authority's investment of $300,000 in the interceptor line is repaid by considering its cost in the annual meter charges to the Borough. Eventually, the Borough will have carried the burden of all this cost. Thus, if the Authority's outlay be considered an aid to the original construction of the entire system, the benefit is to all properties in the sewer district and therefore the ultimate cost should be equitably borne by all within said district. *Cf. Jackson v. Foster,* 192 *Ark.* 712, 94 *S. W. 2d* 113 (*Sup. Ct.* 1936).

We conclude as did the trial court that plaintiffs' properties are subject to these assessments. See *Green v. Hotaling,* 44 *N. J. L.* 347 (*Sup. Ct.* 1882), affirmed 46 *N. J. L.* 207 (*E. & A.* 1884); 14 *McQuillin, Municipal Corporations* §§ 38.61, 38.72 (*3d ed.* 1950); Heyman and Gilhool, "The Constitutionality of Imposing Increased Community Costs on New Suburban Residents Through Sub-Division Exactions," 73 *Yale L. J.* 1119, 1149 (1964).

Affirmed, no costs.

HANEMAN, J. (dissenting). In 1957 the Borough of Paramus (Paramus), pursuant to *N. J. S. A.* 40:36A–50, entered into a contract with the Bergen County Sewer Authority (Authority), an autonomous and independent entity, for

disposal by the Authority of all sewage eminating from within the municipal limits. The Authority thereafter, at its expense, constructed in 1961 an interceptor main which passed over the rear and easterly side of plaintiffs' lands, hereafter described. This interceptor main discharges into the Authority's principal sewer main which in turn channels the sewage to the Authority's disposal plant. At the insistence of the Borough and as part of that agreement, connections were provided in the interceptor main along the rear lines of various properties in order to permit those properties to discharge sewage directly into the interceptor. Such a connection was provided for plaintiffs' lands.

In 1960, the Borough, as part of its municipal sewage system, authorized by ordinance the installation of the first stage (Stage 1) of its lateral collecting sewer lines. The purpose of these lines was the collection of sewage from the lands in a portion of the municipality and the transmission thereof to the Authority interceptor main. The ordinance provided for these collecting lines as a local improvement—18.47% of the cost to be borne by the municipality, the balance to be paid "* * * by special assessments which shall be levied in accordance with law on property specially benefited thereby, as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of said *local improvement."* (Emphasis supplied)

Plaintiffs' property lies within the confines of the territory encompassed by Stage 1. The westerly side thereof has a frontage on the easterly side of Forest Avenue of approximately 550 feet. The lands have no other street frontage. The plot is irregular in shape, having a further westerly length, without street frontage, of upwards of 165 feet and a depth of over 1,000 feet on the northerly side and 1,200 feet on the southerly side.

The Borough installed an 8-inch lateral collecting line on the westerly side of Forest Avenue, which is not available for

use by plaintiffs. The collecting line on the easterly side of Forest Avenue stopped over 185 feet short of plaintiffs' land on the north and an indeterminate distance short of plaintiffs' land in the south. Thus, it is conceded that there is no lateral collecting line into which plaintiffs could tap for the discharge of sewage from their property. The reason for this situation lies in the fact that the elevation of Forest Avenue at plaintiffs' property made it not feasible, without a disproportionately and unreasonably high cost, to construct a collecting sewer line at that location. The Borough engineer testified that the collecting lateral sewer lines in this vicinity were intentionally designed so as not to service plaintiffs' property. In answer to the question, "Am I further correct in the assumption that it was your opinion that this property could be sewered by the Interceptor that had been installed or was about to be installed by the Bergen County Sewer Authority?", he replied: "Yes. This ground generally slopes toward the brook rather steeply and to provide a sewer in Forest Avenue to serve all of the property would have required an excessive depth. It was therefore considered that the Interceptor sewer which was at or near the brook and at a lower level would much better serve the property because it was contemplated and in fact required by the borough ordinance that a tract of this size when subdivided would be required to install its own sanitary sewers."

Plaintiffs, having constructed an office building adjacent to Forest Avenue, applied for, in accordance with the Authority-Paramus contract, and were granted permission by the Authority (with the approval of the local board of health) to tie into and discharge their sewage directly into the interceptor. They ran an 8-inch private sewer line for some 1,200 feet across their lands for this purpose at their own expense.

The contract for the installation of the lateral collecting sewer lines having been completed, the Borough confirmed a special assessment in 1962 against plaintiffs of $18,568.70 for the benefit received from that improvement. The stipulation adverted to in the majority opinion was not that the assess-

ment was "not in excess of the alleged benefits" directly arising from the lateral collecting sewer installation, but rather that it was not in excess of the benefits arising from the interceptor installation. Although the stipulation could have been more clearly articulated, this conclusion becomes self-evident from plaintiffs' firm position that they received no benefits from the collecting sewer.

As noted, plaintiffs argue, as they did before the Law Division, that their lands received no special benefit from the installation of the lateral collecting lines and therefore they are not liable for any assessment. The answer to the question thus posed must be found by relating the above facts to applicable legal principles.

The collecting sewers were installed as a local improvement under *N. J. S. A.* 40 :56–1, which defines that term as :

"A local improvement is one, the cost of which, or a portion thereof, may be assessed upon the lands in the vicinity thereof benefited thereby."

*R. S.* 40 :56–27 provides :

"All assessments levied under this chapter for any local improvement shall in each case be as nearly as may be in proportion to and not in excess of the *peculiar benefit, advantage* or *increase in value* which the respective lots and parcels of real estate shall be deemed to receive *by reason of such improvement.*" (Emphasis supplied)

The determinative test of the liability of lands for a special assessment is, in the statutory language, whether the property received a *"peculiar* benefit, advantage or increase in value \* \* \* *by reason of such improvement."* The definition of peculiar benefit was well expressed in *In re Public Service Electric and Gas Co.,* 18 *N. J. Super.* 357 (*App. Div.* 1952), where the Court said, at *p.* 363 :

"The foundation of the power to lay a special assessment or a special tax for a local improvement of any character, whether it be opening, improving or paving a street or sidewalk or constructing

a sewer, or cleaning or sprinkling a street, is *the benefit* which the object of the assessment or tax confers on the owner of the abutting property, or the owners of property in the assessment or special taxation district, *which is different from the general benefit which the owners enjoy in common with the other inhabitants or citizens of the municipal corporation.*" (Emphasis supplied)

See also *Cirasella v. Village of So. Orange,* 57 *N. J. Super.* 522, 527–528 (*App. Div.* 1959). Special assessments, therefore, can be sustained only upon the theory that the property assessed receives some special benefit from the improvement differing from the benefit that the general public enjoys. 14 *McQuillin, Municipal Corporations* § 38.32, *p.* 121 (*3d ed.* 1950).

It has long been recognized that the "peculiar benefit, advantage or increase in value" to the property assessed must arise from the particular improvement to pay for which the assessment is levied. *Village of Norwood v. Baker,* 172 *U. S.* 269, 19 *S. Ct.* 187, 43 *L. Ed.* 443 (1898); *State, Kellogg, pros. v. City of Elizabeth,* 40 *N. J. L.* 274, 276 (*Sup. Ct.* 1878); *The Tide-water Company v. Coster,* 18 *N. J. Eq.* 518, 527–528 (*E. & A.* 1866). That benefit must flow directly from the improvement for which the assessment was made and not from some other improvement. *Maywood Land Co. v. Rochelle Park,* 13 *N. J. Misc.* 841, 842, 181 *A.* 632 (*Cir. Ct.* 1935); 14 *McQuillin, supra,* § 38.31, *p.* 118. This is not to say that the improvement must be immediately adjacent to such property, but rather that the improvement must have an immediate, peculiar or especial beneficial impact upon the property to be assessed. Propinquity is only one element to be considered in deciding whether such a benefit has accrued to the land in question. See *Cirasella v. Village of So. Orange, supra,* 57 *N. J. Super.,* at *pp.* 529–530; *King v. Reed,* 43 *N. J. L.* 186, 192 (*Sup. Ct.* 1881); *State, Henderson, pros. v. Mayor, etc., of City of Jersey City,* 41 *N. J. L.* 489, 492–493 (*Sup. Ct.* 1879).

The relationship of the improvement to the land must be such that use may be made of that particular improvement,

and the benefit must be a present benefit immediately accruing from the work in question. See *Cirasella v. Village of So. Orange, supra,* 57 *N. J. Super.,* at *p.* 529; *Green v. Town of Montclair,* 125 *N. J. L.* 19, 20 (*Sup. Ct.* 1940); *Morris v. City of Bayonne,* 53 *N. J. L.* 299, 305 (*Sup. Ct.* 1891); *McKevitt v. Hoboken,* 45 *N. J. L.* 482, 486 (*Sup. Ct.* 1883); *King v. Reed, supra,* 43 *N. J. L.,* at *p.* 192; *State, Kellogg, pros. v. Elizabeth, supra,* 40 *N. J. L.,* at *p.* 276; *State, New Jersey R. R. & T. Co., pros. v. City of Elizabeth,* 37 *N. J. L.* 330, 334–335 (*Sup. Ct.* 1875). A landowner, however, may not permanently escape an assessment for an improvement from which he receives no immediate benefit because of its then unavailability to his lands. Where such a situation exists he may, in certain circumstances, be ultimately assessed when further construction by the assessing authority makes the original improvement available to his lands and confers a benefit thereon. See *State, Kellogg, pros. v. Elizabeth, supra,* 40 *N. J. L.,* at *p.* 277. *Cf. Morris v. Bayonne, supra,* 53 *N. J. L.,* at *p.* 301; *R. S.* 40:56–52.

A special assessment levied for a municipal improvement which is not grounded upon, or is in excess of, the special benefit conferred upon the assessed property by such improvement is unconstitutional. In *Village of Norwood v. Baker, supra,* the United States Supreme Court said:

"As already indicated, the principle underlying special assessments to meet the cost of public improvements is that the property upon which they are imposed is peculiarly benefited, and, therefore, the owners do not, in fact, pay anything in excess of what they receive by reason of such improvement. But the guaranties for the protection of private property would be seriously impaired, if it were established as a rule of constitutional law that the imposition by the legislature upon particular private property of the entire cost of a public improvement, irrespective of any peculiar benefits accruing to the owner from such improvement, could not be questioned by him in the courts of the country. It is one thing for the legislature to prescribe it as a *general* rule that property abutting on a street opened by the public shall be deemed to have been specially benefited by such improvement, and, therefore, should specially contribute to the cost incurred by the public. It is quite a different thing to lay it down as an absolute rule that such property, whether

it is in fact benefited or not by the opening of the street, may be assessed by the front foot for a fixed sum, representing the whole cost of the improvement, and without any right in the property owner to show, when an assessment of that kind is made, or is about to be made, that the sum so fixed is in excess of the benefits received.

In our judgment, the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, *to the extent of such excess*, a taking, under the guise of taxation, of private property for public use without compensation. We say 'substantial excess,' because exact equality of taxation is not always obtainable, and for that reason the excess of cost over special benefits, unless it be of a material character, ought not to be regarded by a court of equity, when its aid is invoked to restrain the enforcement of a special assessment." 172 *U. S.*, at *pp.* 278–279, 19 *S. Ct.*, at *pp.* 190–191.

And in *The Tide-water Company v. Coster, supra,* 18 *N. J. Eq.,* at *p.* 527, the Court said:

"Where lands are improved by legislative action, on the ground of public utility, the cost of such improvement, it has been frequently held, may, to a certain degree, be imposed on the parties who, in consequence of owning lands in the vicinity of such improvement, receive a peculiar advantage. By the operation of such a system, it is not considered that the property of the individual, or any part of it, is taken from him for the public use, because he is compensated in the enhanced value of such property. But it is clear this principle is only applicable when the benefit is commensurate to the burthen; when that which is received by the land owner is equal or superior in value to the sum exacted; for if the sum exacted be in excess, then to that extent, most incontestably, private property is assumed by the public. Nor, as to this excess, can it be successfully maintained that such imposition is legitimate as an exercise of the power of taxation. Such an imposition has none of the essential characteristics of a tax."

If, therefore, no such "peculiar" benefit arises from the improvement, an assessment is not only violative of the mandate of *N. J. S. A.* 40:56–1 *et seq.*, but is as well unconstitutional.

We come to a consideration of the facts *sub judice* in the light of the foregoing. In the instant case it is admitted by the Borough that the plaintiffs can make no use now or in the future of the lateral collecting sewer lines for the construction of which they were assessed. Indeed, the municipality intentionally designed the installation so that these lines

would not abut plaintiffs' property, and thereby denied plaintiffs any use thereof. That this was a calculated decision is evidenced by the testimony of the Borough engineer, who stated that the failure to make the collecting lines available to plaintiffs was intentional and that the Borough required owners of plots the size of plaintiffs to furnish their own lines for transmission of sewage to the interceptor. It should be noted parenthetically that the line which plaintiffs installed for that purpose was of the same dimension as the municipal line on Forest Avenue, i. e., an eight-inch pipe, quite clearly a substitute for the municipal collecting line.

The conclusion is inescapable that plaintiffs' property received not only no "peculiar" benefit from the lateral collecting sewer lines but actually received no benefit of any kind therefrom. Hence plaintiffs should not be subject to the levy of any special assessment for that improvement. See *In re Township of North Bergen,* 10 *N. J. Misc.* 935, 937, 161 *A.* 807 (*Cir. Ct.* 1932) ; *Beattie Mfg. Co. v. Little Falls Twp.,* 7 *N. J. Misc.* 161, 163, 144 *A.* 634 (*Sup. Ct.* 1929).

But the majority herein reasons that the interceptor would not have been installed by the Authority under its contract with the Borough except upon the actual or implied agreement of the latter to supply a lateral collecting sewer system through which all sewage of the municipality would flow into the Authority interceptor main. They rationalize that the Authority interceptor and the Borough collecting lines in reality constitute a single sewerage system. They conclude, in effect, that the special benefit received by plaintiffs from the construction of the lateral collecting lines was the earlier installation of the interceptor, which was constructed by the Authority in reliance upon fulfillment by the Borough of its obligation to install collecting lines which would discharge the municipal sewage into the interceptor. The answer is severalfold.

In the first place, the benefit to plaintiffs' lands, which the majority herein finds, is not that which flows from the installation of the collecting lines by the Borough, as a part of the

local improvement authorized by ordinance, but from the construction of the interceptor by the Authority. The Borough has no power to levy a special assessment for this construction by the Authority.

In the second place, the power to levy an assessment is statutory. *N. J. S. A.* 40:56–1 *et seq.* That statute requires, as above noted, a "peculiar" benefit which under our cases has been defined as an "especial" benefit that must arise directly from the particular improvement for which the assessment is levied and not some other improvement.

The Borough, admittedly, could have constructed the interceptor main with municipal funds. This it could have accomplished as a local improvement. The cost thereof could then have been distributed among the persons ultimately discharging sewage into such interceptor by assessing the properties served for the individual benefits received, whether the users tapped directly into the interceptor main or discharged their sewage indirectly through the collecting sewer lines. But then, the users of the lateral collecting sewer lines would have had to stand an additional assessment for the benefits received from the installation of those collecting lines which those making direct connection into the interceptor main would not have to bear. See *R. S.* 40:56–52.

However, the municipality in the instant case elected to pursue an alternative course by permitting the Authority to install the interceptor at Authority cost, thereby saving the Borough the original outlay of $300,000. That cost is being absorbed by annual sewer charges paid by *all persons* whose sewage finds its way into the interceptor, whether by direct discharge of sewage, as in the case of plaintiffs, or indirect discharge through the municipal collecting lines. See *N. J. S. A.* 40:36A–43, 45. Thus plaintiffs and all other users are standing the cost of the construction of the interceptor through annual installment payments. The benefit so received from the interceptor main and paid for by all owners of properties whose sewage ultimately flows into the interceptor is analogous to a "general benefit which the owners enjoy in

common with the other inhabitants or citizens of a municipal corporation." *In re Public Service Electric and Gas Co., supra.* As stated, plaintiffs herein do not enjoy any benefit from the interceptor main that is not enjoyed by any other user whose sewage is eventually discharged into the interceptor. Having undertaken the construction of the interceptor in a manner other than by a local special assessment the municipality cannot now, under the guise of assessing for the benefits received from the construction of the collecting lines, transmute the interceptor installation into a local assessment improvement. *Cf. River Edge Homes, Inc. v. Borough of River Edge,* 130 *N. J. L.* 376, 380–381 *(Sup. Ct.* 1943) ; *R. S.* 40 :56–52.

The Borough saw fit not to pay for and make provision for the removal of sewage from plaintiffs' lands through the collecting lateral system but placed the obligation to accomplish that result upon plaintiffs at their own expense. The special or peculiar benefit which can be attributed to the lateral collecting lines is enjoyed solely by the properties which have the privilege or at least the eventual possibility of tapping into the laterals for discharge of sewage originating on their lands. If this assessment is affirmed plaintiffs must pay not only for the line which they have presently installed at their own expense on their own lands, and any future lines required in a subdivision of their comparatively large tract, but must as well share the expense of installing a similar system for the exclusive use and benefit of other property owners—a system the use and enjoyment of which they are and will be denied. The result is tantamount to a double taxation and a taking of private property for public use without compensation. It is to that extent unconstitutional.

Also, assuming that the municipality has the duty to force all property owners to discharge their sewage into the Authority's system, it has selected two methods of fulfilling that obligation. It had provided the collecting lines (at initial municipal expense with the property owner to ultimately bear the expense through assessments) and, where the collecting line

is not available, as in the case of the plaintiffs' land herein, it has arranged for such property owners to construct collecting sewers at their own expense in order to tap into the interceptor. The good faith of the municipality in refusing to make its collecting sewer available to plaintiffs is not questioned. This was no special privilege intentionally granted plaintiffs but was rather a decision based on topographical facts and grounded in lessening the financial burden of the users of the collecting system. In thus electing to force plaintiffs to install their own connecting lines, the municipality has fulfilled whatever duty it had under its contract with the Authority to oblige all property owners within the corporate limits to discharge sewage into the interceptor.

The fact that the cost of the line which plaintiffs installed at their own expense may have been less than the assessment levied against properties specially benefited by the collecting lines is of no consequence.

Research has disclosed no adjudication similar to the construction of special benefits arrived at by the majority. They have here extended the definition of "benefit" beyond the limits of the statutory language. As stated by this Court in *Kingsley v. Hawthorne Fabrics, Inc.*, 41 *N. J.* 521 (1964), at *pp.* 528–530:

"As was said in *Gould v. Gould*, 245 *U. S.* 151, 153, 38 *S. Ct.* 53, 62 *L. Ed.* 211, 213 (1917) :
'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen.'
 *  *  * We agree with Justice Heher in *Pub. Ser. etc. Transport v. State Bd. Tax Appeals, supra*, at *p.* 104 of 115 *N. J. L.*, where he said, 'The legislative body must express its intention to tax in distinct and unambiguous language.' "

The majority's conclusion that an assessment may be levied under the facts herein is beyond the clear impact of the statute and embraces a matter not specially pointed out therein.

In that situation, even though there should be some doubt, the statute must be construed most strongly against the Borough and in favor of plaintiffs.

I would reverse.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—Justice HANEMAN—1.