ANDREW, J.T.C.
In this state tax case, plaintiff, Edgeboro Disposal, Inc., challenges a determination by the Director of the Division of Taxation that adjusted and increased plaintiff’s reported tax and escrow account liabilities pursuant to a series of taxing *466 statutes in the Solid Waste Management Act relative to disposal of solid waste. See N.J.S.A. 13:lE-95a., -104a., -109a., -138a., -138b.(l).
Plaintiff, a New Jersey corporation, was the operator of a sanitary landfill, otherwise referred to as a solid waste facility, commonly known as the Edgeboro Landfill in East Brunswick Township until December 31, 1987. At that time the landfill operations were terminated at the Edgeboro facility in accordance with a joint order issued by the Department of Environmental Protection (DEP) and the Board of Public Utilities (BPU) dated June 12, 1987.
On January 22, 1988, plaintiff filed its consolidated sanitary landfill tax return for December 1987. The various taxes and escrow accounts implicated in this proceeding are measured by the volume or weight of the solid waste accepted for disposal at a landfill facility. Ibid. Plaintiff’s return reflected that 474,-417 cubic yards of solid waste had been accepted for disposal at the Edgeboro facility. Plaintiff, however, in its calculation of the taxes and escrows to be remitted to the Division of Taxation deducted 85,753 cubic yards of solid waste from the actual volume received at the facility. Apparently, this adjustment was made by plaintiff to reflect the fact that it had not been paid by certain waste haulers for this volume of solid waste and it was doubtful that plaintiff would ever collect such payments.
After review of plaintiff’s tax return, the Division of Taxation concluded that there was no legal basis for the deduction made by plaintiff, and thus, issued a deficiency notice to plaintiff in the amount of $169,941.92. After a conference conducted at plaintiff’s request, the Director of the Division of Taxation issued a final determination which affirmed the prior deficiency assessment which, with a more current calculation of interest and penalties, then totaled $176,998.37. Plaintiff filed a complaint in this court challenging the Director’s final determination.
Plaintiff argues that it should not be required to pay the taxes and escrow account amounts attributable to the 85,753 *467 cubic yards of solid waste, admittedly received by it at its disposal site, but for which it was not paid, because it did not “voluntarily” accept such solid waste.
Plaintiff maintains that a chain of events commencing in 1984 led to plaintiff’s present predicament and that it would be both inequitable and unconstitutional to require plaintiff to remit the deficiency assessed by the Director. Plaintiff notes that when DEP issued its approval to plaintiff for the operation of the Edgeboro facility on January 30, 1984, the landfill had a designed capacity of approximately 300 to 400 truckloads of solid waste per day.
Beginning in April 1984 and continuing to January 1985 DEP and BPU issued a number of redirection of solid waste flow orders which directed the disposal of solid waste to the Edgeboro facility instead of three other sanitary landfills because of the closure of those landfills. These redirection orders increased the volume of solid waste being directed to the Edgeboro facility from 300 to 400 truckloads per day to approximately 1300 truckloads per day.
Plaintiff contends that these redirection orders[1] had a severe impact on plaintiff’s landfill operation and caused the facility to reach its design capacity on or about June 20, 1987, approximately 5V2 years before its originally projected expiration of December 31, 1992.
Apparently, plaintiff was about to terminate its landfill operation in June 1987, but on June 12, 1987, DEP and BPU issued a joint order that required the Edgeboro facility to continue to accept solid waste for disposal until December 31, 1987. This joint order was based on the joint agency determination that the Edgeboro facility could safely accommodate an additional 1.8 million cubic yards of solid waste if it were properly designed and operated and more important, a garbage crisis would ensue if Edgeboro terminated operations in June 1987.
*468 Plaintiff did not challenge the June 12,1987 joint order in any court proceeding. Instead, on June 24, 1987, it sought an emergency rate increase from BPU. BPU permitted a rate increase, effective August 13, 1987, from $3.04 a cubic yard to $15.05 a cubic yard. The order also approved, “effective for services rendered on and after October 5, 1987,” plaintiff’s request to bill its hauler-customers on a cash basis when service was rendered.
Because of BPU’s recognition of the effect the permitted rate increase would have on the cash flow position of various solid waste haulers, BPU, on August 24, 1987, issued an order directing that: (1) haulers who were on a cash basis with plaintiff could continue delivering solid waste and pay cash at the old lower rate until October 1, 1987 and credit would be extended for the difference between the old rate and the new higher rate until October 5, 1987,[2] and (2) haulers who were on a noncash or credit basis with plaintiff would continue on a credit basis until October 5, 1987.
Plaintiff maintains that during the time it was required to receive the excessive amounts of solid waste, in accordance with the redirection orders issued by DEP and BPU, many *469 haulers defaulted in their payments to plaintiff either because of the rate increase permitted by BPU on August 13, 1987 or because these haulers knew plaintiff would cease its landfill operation on December 31, 1987.
Additionally, plaintiff points out that the June 12, 1987 joint order of DEP and BPU which required plaintiff to continue its landfill operation until December 31, 1987 also barred plaintiff from accepting any waste generated in New York. Plaintiff contends that, as a result, a number of New York haulers defaulted on their indebtedness to plaintiff because they were not permitted to deliver out-of-state solid waste to plaintiffs facility.[3] Plaintiff maintains that the cumulative effect of all of the orders and actions of DEP and BPU was to place plaintiff in the precarious position of having to accept solid waste for disposal (which is the event that triggers the various taxes and escrow account amounts) from haulers who defaulted in their obligations to plaintiff.
Plaintiff indicates that it has made diligent efforts to collect payment from the delinquent haulers and has, in fact, paid the taxes assessed when its collection efforts were successful. Moreover, plaintiff, at present, continues to do so. Despite its efforts, however, plaintiff has been unable to collect a substantial amount owed to it by delinquent haulers.
Specifically, plaintiff presents three arguments to support its position that the Director must be required to abate the assessed taxes, penalties and interest. First, plaintiff asserts that to require plaintiff to pay the assessed taxes is “contrary to the legislative intent of the Solid Waste Management Act.” Second, plaintiff contends that the actions of defendants, DEP and BPU, violate constitutional due process and equal protection guarantees. Third, plaintiff contends that the actions of defendants, DEP and BPU, in compelling plaintiff to allow *470 defaulting haulers to deliver solid waste to plaintiffs facility, constituted an unconstitutional taking which resulted in the uncollectible taxes assessed by the Director, and the Director’s assessment, itself, is an unconstitutional taking.
In response to plaintiff’s first contention, defendants argue that the plain meaning of the taxing provisions control and therefore, since the events which triggered the taxes occurred, i.e., since plaintiff “accepted” the solid waste for disposal, plaintiff was correctly assessed by the Director. With regard to plaintiff’s constitutional arguments, defendants simply maintain that these are irrelevant because these arguments relate, if at all, to actions of DEP and BPU which are not at issue in this case. The sole issue in this case is the propriety of the Director’s assessment of taxes.
I.
Plaintiff’s first argument focuses on the correct interpretation of the language found in each of the taxing provisions at issue. In relevant part these statutes provide as follows:
N.J.S.A. 13:lE-95 Recycling tax on solid waste facilities.
a. There is levied upon the owner or operator of every solid waste facility a recycling tax of $1.50 per ton of all solid waste accepted for disposal or transfer at the facility. In the event that any solid waste is measured upon acceptance for disposal or transfer by other than tons, the tax shall be levied on the equivalents thereof as shall be determined by the director____ [Emphasis supplied]
N.J.S.A. 13:1E-104. Sanitary Landfill Closure and Contingency Tax.
a. There is levied upon the owner or operator of every sanitary landfill facility a tax to insure the proper closure thereof and to provide funds to compensate for any damages resulting from the operations or closure of the facility____
b. (1) Every owner or operator of a sanitary landfill facility shall, on or before the 20th day of the month following the close of each tax period, render a return under oath to the director on such form as may be prescribed by the director indicating the number of cubic yards of solid waste and gallons of liquid waste accepted for disposal and at said time the owner or operator shall pay the full amount of tax due____ [Emphasis supplied]
*471 N.J.S.A. 13:1E-109. Escrow Account for Closure.
a. The owner or operator of every sanitary landfill facility shall deposit, on a monthly basis in an interest-bearing account with an accredited financial institution, an amount equal to $1.00 per ton of all solid waste accepted for disposal during the preceding month at the sanitary landfill facility. In the event that any solid waste is measured, upon acceptance for disposal, by other than tons, the amount to be deposited shall be calculated by using the equivalents thereof as shall be determined by the division____ [Emphasis supplied]
N.J.S.A. 13:1E-138a. Solid Waste Services Tax.
There is levied upon the owner or operator of every sanitary landfill facility a solid waste services tax. The services tax shall be imposed on the owner or operator at the initial rate of $0.50 per ton of solids and $0,002 per gallon of liquids on all solid waste accepted for disposal at a sanitary landfill facility. On the first day of the first calendar year following the imposition of the services tax, and annually thereafter, the rate of the services tax shall be increased by $0.05 per ton of solids. No services tax shall be levied on the owner or operator of a sanitary landfill facility for the acceptance for disposal of the waste products resulting from the operation of a resource recovery facility. [Emphasis supplied]
N.J.S.A. 13:1E-138b.(l). Resource Recovery Investment Tax.
There is levied upon the owner or operator of every sanitary landfill facility a resource recovery investment tax. The investment tax shall be levied on the owner or operator at the initial rate of $1.00 per ton of solids and $0,004 per gallon of liquids on all solid waste accepted for disposal at a sanitary landfill facility. No investment tax shall be levied on the owner or operator of a sanitary landfill facility for the acceptance for disposal of the waste products resulting from the operation of a resource recovery facility____ [Emphasis supplied]
As can readily be seen, the event which triggers either a tax or an escrow deposit is the “acceptance” of solid waste “for disposal” by the “owner or operator” of the sanitary landfill. Plaintiff maintains that the Director’s assessment in this case is “contrary to the legislative intent of the Solid Waste Management Act.” Plaintiff makes a two-step argument in support of its contention that the Legislature intended an abatement of taxes in factual circumstances such as those presented by plaintiff in this case.
First, plaintiff maintains that the word “accept” in the tax-triggering phrase “accept for disposal” in each of the above mentioned statutes necessarily implies that plaintiff must have *472 received the solid waste “voluntarily” or “willingly” rather than under the compulsion of a joint order of DEP and BPU. Second, only when plaintiff received payment from the hauler who deposited solid waste at plaintiff’s landfill did plaintiff receive the solid waste “voluntarily” or “willingly.” Plaintiff points to two dictionary definitions of the word “accept” to support its two-step hypothesis. According to plaintiff, Webster’s New Twentieth Century Unabridged Dictionary (2 ed 1976) defines the act of accepting as “the taking or receiving with a consenting mind, voluntarily or willingly,” id. at 10, while Black’s Law Dictionary (5 ed 1979) defines the act of accepting as “[t]o receive with approval or satisfaction; to receive with intent to retain.”
Thus, from these definitions, although it is not totally clear, plaintiff seems to contend that it did not “accept” solid waste for disposal after the June 12, 1987 joint order issued by DEP and BPU because it did not voluntarily receive or “accept” such solid waste. Then, plaintiff seems to argue that the Legislature’s use of the word “accept” implies that, an owner or operator of a landfill “voluntarily” permits solid waste to be deposited at its site only when the landfill operator receives the appropriate charges (including taxes) for each truck load of solid waste deposited.
Preliminarily, it must be observed that plaintiff’s argument is foreclosed by its failure to challenge the June 12, 1987 joint order of DEP and BPU. Plaintiff cannot accept the order and then seek to challenge one of its consequences long after the time for such challenge has expired. If plaintiff believed that the joint order was legally inappropriate for whatever reason it should have been contested on a timely basis. What plaintiff seeks to do in this court is to challenge one of the legitimate consequences of the joint order and plaintiff’s performance in accordance therewith. Although plaintiff claims that its acceptance of solid waste after the joint order was involuntary there is nothing to demonstrate that it was, in fact, against its will.
*473 Second, plaintiffs two-step argument is not persuasive for another reason. The word “accept” has not been solely defined as narrowly as suggested by plaintiff. As noted in Black’s Law Dictionary, one meaning of the word “accept” is that of “to receive with intent to retain.” See also The American Heritage Dictionary (2 coll. ed. 1982) at 71 (accept means “[t]o receive (something offered) ...) and Funk & Wagnalls New Comprehensive International Dictionary (Encyc. ed. 1978) at 9 (accept is defined as “[t]o take when offered” or “[t]o take with good grace; submit to: to accept the inevitable.”)[4] The meaning as set forth in Black’s Law Dictionary is perfectly consistent with what plaintiff did in this case albeit under the direction of a joint agency order. As the Director notes, and plaintiff does not dispute, plaintiff did, in fact, “receive with the intent to retain” or “accept for disposal” the 85,753 cubic yards of solid waste for which it was not paid.
Distilled to its essence, plaintiff’s argument is that the Legislature, in its use of the word “accept,” intended that landfill operators must be paid before their “acceptance” of solid waste is complete. Logically then, if plaintiff is correct, even without the alleged compulsion of joint agency orders, each receipt of solid waste by a landfill operator is a conditional acceptance until the operator is paid. This, in effect, makes the landfill operator and the Division of Taxation partners in the operation of the landfill. If the landfill operator is paid, the Division receives its taxes, but if the landfill operator is not paid then the taxes need not be paid.
Clearly, if the Legislature had intended this unusual arrangement, it would have specifically provided for such an exception. As the Director aptly indicates there “is no exception in any statute to payment of the taxes by the owner or operator of the landfill based on the uncollectability of debts owed by haulers *474 to the landfill operator.” See Bernards Tp. v. Taxation Div. Director, 7 N.J. Tax 99, 105 (Tax Ct.1984) (a legislative intent to grant an exemption must be clearly expressed and a court will not infer an exemption from the absence of a specific provision.)
Simply stated, plaintiff asks too much of the word “accept.” Absent a specific legislative tax exception or exemption, the responsibility for the payment of the taxes and escrow accounts at issue is plaintiffs. Absent a legislative grant of authority to permit an exception, the Director simply does not have the power to permit an abatement of the taxes.[5]
Plaintiff also argues that the taxes at issue should be abated because the Legislature never intended the taxes to be paid by the owner or operator of a landfill. This is so, according to plaintiff, because a legislative committee had characterized the payment of the taxes at issue as “pass through” costs. In other words, plaintiff contends, it was intended that the cost of the taxes could be passed on, or charged, to the waste generators through the waste collectors or haulers. Plaintiff maintains that this legislative objective of “passing through” the costs was thwarted in this case because a number of haulers failed to pay solid waste disposal charges to plaintiff for waste deposited at plaintiffs Edgeboro facility.
The Director does not dispute the fact that the Legislature permitted landfill operators to “pass through” the cost of the taxes to waste haulers who could, in turn, pass the costs to their customers, the waste generators. Notwithstanding this, the Director notes that the “pass through” cost was to be shown on the landfill operators’ bills and the waste haulers’ *475 bills not as a tax but as a surcharge mandated by law. See 11 New Jersey State Tax News, No. 4 (July-August 1982) at 98.
Thus, in spite of the fact that the costs could be passed through to the hauler and its customers, as the Director correctly asserts, “the statutes explicitly imposed all five landfill taxes on the owners and operators of the sanitary landfill who accepted solid waste for disposal.”
Plaintiff contends that the history of the Solid Waste Management Act supports its position that the Legislature never intended that a landfill operator, such as plaintiff, would have to pay the requisite taxes and escrow accounts unless it received payment from its haulers. Plaintiff does not, however, point to anything in the legislative history that explicitly supports this assertion. Moreover, the language of the taxing provisions is to the contrary.
II.
Next, plaintiff maintains that the actions of DEP and BPU in the issuance of orders compelling plaintiff to accept excessive amounts of solid waste combined with the Division of Taxation’s refusal to abate taxes, relative to plaintiff’s uncollectible accounts, violates plaintiff’s due process and equal protection guarantees.
Plaintiff argues that the Director’s assessment is invalid because it makes no allowance for the fact that plaintiff was compelled to accept inordinate amounts of solid waste by joint orders of DEP and BPU issued during the period of April 1984 to January 1985, and further, that plaintiff was compelled to continue to operate until December 31, 1987 by the joint order of DEP and BPU dated June 12, 1987. According to plaintiff, these agency actions forced plaintiff to operate inefficiently, unprofitably and beyond its designed capacity.
The Director, in response, asserts that all of plaintiff’s constitutional arguments are irrelevant to the Director’s assessment, but rather, are aimed at the agency orders issued by DEP and BPU which are not at issue in this case. The only issue in this *476 case, according to the Director, is the propriety of the Director’s assessment. I agree.
The irrelevancy of plaintiff’s constitutional arguments is clearly revealed in plaintiff’s contention relative to a denial of equal protection. Plaintiff does not assert that the taxing provisions operate differently on different landfill operators, but, instead, maintains that, because of the agency orders issued by DEP and BPU, it “is not similarly situated as other sanitary landfills within the State and cannot be treated similarly.” Instead of arguing that it is being treated differently from other landfill operators, plaintiff contends that the taxing provisions should, in fact, treat plaintiff differently than other landfill operators because of the “oppressive directives of the joint DEP and BPU orders.”
As the Director correctly points out, plaintiff seeks to litigate the legal propriety of the joint orders issued by DEP and BPU not the manner in which the taxing statutes are applied. As the Director also notes, without contradiction by plaintiff, the taxes at issue “have been imposed evenhandedly on all owners and operators of sanitary landfills and there has been no discriminatory classification in the assessment of the taxes between [plaintiff] and other similarly situated sanitary landfills within the State.”
The taxing provisions at issue treat all landfill owners or operators in a like or similar manner. See Robson v. Rodriquez, 26 N.J. 517, 523, 141 A.2d 1 (1958); see also Wilson v. Long Branch, 27 N.J. 360, 377, 142 A.2d 837 (1958) cert. den. 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958) (the requirement of equal protection is satisfied if all persons within a class reasonably selected are treated alike). Plaintiff’s claim of discrimination does not relate to the taxing provisions but to the prior orders of DEP and BPU which are outside the parameters of the present proceeding.
In a similar vein, plaintiff’s due process argument relates to the joint agency orders of DEP and BPU and not to the taxing provisions at issue nor to the Director’s assessment *477 pursuant to those statutory provisions. Specifically, plaintiff claims that it sought to terminate its landfill operation in June 1987. Its landfill operation was continued beyond June 1987 until December 31, 1987, according to plaintiff, only because DEP and BPU extended the operating period through its joint directive dated June 12, 1987. As a consequence, plaintiff was required to continue to operate inefficiently and unprofitably. Plaintiff contends that the uncollected taxes which were assessed by the Director was an “unanticipated adverse consequence of the extraordinary demands placed upon [plaintiff] by DEP and BPU.” The Director’s refusal to abate the taxes at issue in light of the circumstances, according to plaintiff, constitutes a denial of due process.
Again, as the Director responds, plaintiff’s objections are to the orders issued by DEP and BPU which are not subject to litigation in this proceeding. Plaintiff had the opportunity to fully litigate its objections to those orders. The effect of those orders whether anticipated or unanticipated cannot be litigated here under the pretext that the constitutionality of the taxing statutes are at issue.
The third constitutional argument set forth by plaintiff is to the effect that to require plaintiff to pay taxes and make escrow deposits for delinquent hauler accounts is an unconstitutional taking prohibited by both the United States Constitution and the New Jersey Constitution. Here again plaintiff’s specific complaints relate, generally, to the redirection waste flow orders issued by DEP and BPU, and particularly, to the joint agency order of June 12, 1987 which directed plaintiff to continue its landfill operation until December 31, 1987.[6] Plaintiff’s argument, in fact, relates to an alleged regulatory taking as a result of the June 12, 1987 joint agency order. Again, plaintiff seeks to litigate an unfavorable consequence of that *478 order. As the Director again points out, neither the taxing provisions nor the Director’s assessment made in accordance with the taxing provisions constitute an unlawful taking of any property.
Lastly, in an attempt to liken the taxes at issue with assessments for public improvements, plaintiff asserts that the assessment of taxes at issue exceeds the benefits accruing to plaintiff, and therefore, is a taking under the guise of taxation. This argument is wide of the mark. The assessment at issue is clearly for accrued taxes pursuant to statute and not an assessment for public improvements. See generally Gabriel v. Paramus, 45 N.J. 381, 383-385, 392-398, 212 A.2d 550 (1965). Additionally, as the Director has set forth, “taxes are not required to be shared equally by all taxpayers for taxes to pass constitutional muster.” See Sheridanville, Inc. v. Wrightstown Bor., 125 F.Supp. 743, 753 (D.N.J.1954) (“[T]axes otherwise lawful are not invalidated by the fact that resulting benefits are unequally shared.”)
One last point requires brief mention. Plaintiff has vigorously insisted that it was forced to extend credit to haulers that were on an all cash basis with plaintiff during the period of August 24, 1987 through October 5, 1987 and further that it was required to extend credit to all its credit-based haulers for the same period and that this was one of the reasons why plaintiff was not able to collect the “taxes” from the various defaulting haulers. Consequently, it would be inequitable to require plaintiff to pay those taxes.
A review of the order issued by BPU on August 24, 1987 reveals that plaintiff was only required to extend credit to all cash-basis haulers to the extent of the difference between the old rate and the new increased rate. The old rate, which plaintiff could have insisted be in cash at delivery, was more than sufficient to cover the taxes required by the taxing provisions at issue. Plaintiff notes, however, that it was required to extend full credit at the higher increased rate for those haulers that were previously on an all credit basis with plaintiff. That *479 was not unreasonable under the circumstances, since it was plaintiff who had originally determined which of its haulers was to be on a credit or cash basis. BPU simply extended plaintiffs own determination for the period of August 24, 1987 to October 5, 1987 at which latter time all haulers were placed on a full cash basis with plaintiff.
Moreover, plaintiffs arguments belie its own actions. As conceded by plaintiffs general manager at trial, plaintiff, on and after October 5, 1987, could have insisted on full cash payment from haulers at the time solid waste was deposited at its landfill facility, yet, plaintiff continued to extend credit.
The record does not reveal whether, or to what extent, the claimed delinquencies involved haulers to whom plaintiff voluntarily extended credit or was required to extend credit by unchallenged BPU rate orders. Thus, plaintiff has not shown any inequity in the operation of the taxing provisions at issue.[7]
The Clerk of the Tax Court is directed to issue a judgment affirming the final determination of the Director of the Division of Taxation.

 PIaintiff asserts, and defendants do not dispute, that these redirection orders were unsuccessfully challenged in numerous court proceedings.

 There is some ambiguity in BPU's August 24, 1987 order with regard to the date when all haulers were to be placed on an all cash basis at the new higher rates approved by BPU on August 13, 1987. BPU’s order of August 13, 1987 approved plaintiffs request to put all haulers on a full cash basis, effective October 5, 1987, at the increased rates permitted by the same order. Thereafter, BPU, by order dated August 24, 1987 distinguished between the haulers who were previously on a cash basis with plaintiff and those who were on a credit basis with plaintiff prior to the permitted rate increase. The cash basis haulers were permitted to deliver solid waste to plaintiffs facility upon cash payment of the old lower rate and obtain credit for the difference between the two rates. What is not clear is whether that required extension of credit for the difference between the two rates was to stop on October 1, 1987 or October 5, 1987. What is clear is that BPU expected all cash basis haulers to have paid all accrued credit allowances by November 1, 1987.
With regard to haulers that were on a noncash or credit basis with plaintiff prior to the rate increase of August 13, 1987, BPU permitted those haulers to continue on a credit basis at the new higher rates until October 5, 1987 when those haulers were also placed on a cash basis at the higher rates.

 Plaintiff mentioned the default of a number of New York haulers simply to show the negative effect the order of June 12, 1987 had on plaintiffs cash position.

 The commonly noted synonym for “accept” is “receive.” See Webster's New International Unabridged Dictionary (2 ed 1952) at 14. The converse is also true, "accept” is the common synonym for "receive.” Id. at 2076; see also Webster’s Third New International Unabridged Dictionary (1981) at 10.

 Plaintiff argues that the Director does have the authority to grant an abatement of the taxes and points to N.J.S.A. 13:1E-95d. and -104d. as providing such authority. Both statutes permit the Director to waive penalties if the circumstances warrant, not taxes. As a matter of fact, these statutes, instead of supporting plaintiffs argument, are implicit support for the fact that the Director cannot abate taxes without specific legislative authority to do so.

 Plaintiff seeks to avoid the fact that it did not make a timely challenge to the June 12, 1987 joint agency order by asserting that it would have been a futile effort under the circumstances existing throughout the State at that time.

 In any event, any consideration of whether plaintiff s argument presents a more equitable approach to the question of the taxes at issue is irrelevant to the present inquiry. It is the function of this court to enforce the legislative mandate as embodied in the taxing statute provided there are no constitutional constraints. There are none in this case.