PER CURIAM.
Plaintiff Edgeboro Disposal, Inc., the operator of a sanitary landfill which closed on December 31, 1987, appeals from a judgment of the Tax Court rejecting its claims for relief from a determination of the Director of the Division of Taxation fixing its final year’s tax and escrow obligations under the Solid Waste Management Act, N.J.S.A. 13:lE-95a, -104a, -109a, -138a, and 138b(l). We affirm substantially for the reasons set forth in Judge Andrew’s opinion, reported at 11 N.J.Tax 463 (Tax 1991).
We add the following observations. As the Tax Court opinion makes clear, plaintiffs argument is predicated on the taxing base of the five separate provisions of the Act, namely, the volume of solid waste accepted by the landfill operator. Plaintiffs thesis is that “accepted” under the Act must be construed as “voluntarily accepted” by the landfill operator as a matter of its own business judgment, whether or not sound. It contends that it is, therefore, not chargeable for the volume of solid waste it was compelled to accept by governmental regulation in the form of redirection orders issued by the Department of Environmental Protection (DEP) and as to which the customer did not pay the dumping fee.
*141 The argument, as we understand it, is based on certain assumptions. It assumes that in the ordinary course, the landfill operator, depending on the credit worthiness of the customer, can determine whether to deal with him on a cash or credit basis. It apparently also assumes that if a cash-basis customer does not pay, the landfill operator is not required to continue to do business with him. Since, under this scenario, the landfill operator has exercised its own business judgment as to credit worthiness, it may be deemed to have voluntarily accepted the solid waste dumping of all its customers, including those who default on an extension of credit. Thus it does not object to the volume tax basis even if it has not been paid the dumping fee in full.
Plaintiff contends, however, that this was not the scenario which obtained here. It argues that as a consequence of both the DEP redirection orders and two August 1987 rate orders of the Board of Public Utilities (BPU), it was forced to accept customers who were not credit-worthy, to whom it would not have voluntarily extended credit, and who did not pay the dumping fee. In sum, it asserts that it is fundamentally unfair to impose a tax, especially a tax which, as here, is akin to a pass-through tax, on dumped volume for which it has not been paid. To do so, it asserts, would require it not only to have lost the dumping fee but also, in effect, to pay tax on the fees it never received. Urging that such a patently unjust result could never have been intended by the Legislature in imposing the solid waste tax scheme, plaintiff argues that the volume dumped by the non-paying, compelled customers must be regarded as not voluntarily accepted and hence should be excluded from the tax calculation.
If plaintiffs characterization of the legal issue were supported by what we understand to be the facts of record, we would ascribe a substantial degree of merit to its position. We would, as well, question the observation of the Tax Court judge that plaintiffs failure to appeal from each of the regulatory and rate orders renders voluntary its acceptance both of the regulatory scheme and of the volume of solid waste deposited thereunder voluntary. Our reservation on this score would be further based upon plain *142 tiffs singular lack of success in contesting earlier regulatory orders, albeit not the later and critical August rate orders of the BPU. But we need not address these matters further since the problem with plaintiffs case lies not in its legal theory but in the facts. In short, the facts do not fit the theory.
First, we understand from representations made to us at oral argument that as a result of plaintiffs accounts receivable collections in the intervening years since closure, on which taxes have been periodically remitted, the only compelled customer whose dumped volume remains in dispute is Metro Disposal Company, which declared bankruptcy some time ago. Metro was a cash customer, paying the uniform dumping fee of $3.04 per cubic yard. Presumably, this rate included the five “pass-through” taxes.[1] The situation changed in August 1987 as a result of the two rate orders of BPU which give rise to this controversy.
Plaintiff had applied to BPU for significant rate relief to assist it in meeting the expenses it would incur as a result of having to stay open for six months beyond its originally scheduled closure date. As recited by the ensuing BPU order, plaintiff anticipated “increases in operating, closure/post-closure expenses and self-insurance necessitated by the” joint BPU/DEP order directing it “to remain open beyond its theretofore permitted closure date.” Accordingly, on August 13, 1987, BPU entered the first of the two relevant rate orders granting a $12.01 rate increase by raising the cubic yard fee from $3.04 to $15.05. In order to assure that this increased revenue was used for the stated expenses, the order further required that $11.83 of the increase, that is, all but $.18 *143 per cubic yard, be placed in escrow to meet, in stated specific amounts, plaintiffs expenses for self-insurance (environmental general liability), tax liability (self-insurance), river erosion repair, capital appropriations and post-closure expenses. There is nothing in the record to suggest that any part of the increase was earmarked for Solid Waste Management Act taxes and escrows. Nor is there anything in the record to suggest that plaintiff was required to make an escrow deposit on account of any rate increase billed that it did not actually receive.
Under the August 13, 1987, order, matters would presumably have proceeded as before, and Metro would have had to pay $15.05 per cubic yard as it dumped. The problem which plaintiff faced was attributable to a second BPU order issued on August 24,1987. As described by Judge Andrew, that order gave cash-basis haulers a limited grace period by requiring plaintiff to extend credit to them for the amount of the increase until October 5, 1987. The effect of this order was that Metro, from the period of August 13 to October 5, paid a cash fee of $3.04 per cubic yard as it dumped and Edgeboro was required to extend it credit over this period in the amount of the $12.01 increase. It is this mandated extension of credit, on which Metro defaulted, which is the basis of plaintiffs complaint.
In our view, what really happened was not plaintiffs being saddled with a compelled customer, who was dumping a volume of solid waste without paying any fee at all. The reality of the situation was, on a worst-case basis in the event of ultimate default in payment of the increase, nothing more than a deferral for certain cash-basis haulers of the effective date of the rate increase. Since those haulers were continuing to pay the original rate, which was, moreover, adequate to provide for the five-tax payment, we cannot conclude that deferral of the rate increase was tantamount to requiring plaintiff to pay tax on a dumped volume for which no dumping fees were paid. This is particularly so in view of the dedication of all but $.18 of the increase to designated non-tax purposes. That, as we see it, is the flaw of plaintiffs construct.
*144 There is one final matter. In 1990 plaintiff filed an amended return seeking adjustment of the 1987 tax on the basis of its own bookkeeping errors. It claims that it inadvertently double billed several customers for whom multiple accounts were maintained in different names. Insofar as we can determine from this record, that claim has not yet been acted upon by the Division of Taxation. In any event, it was not considered by the Tax Court on this appeal. The claim is consequently premature for our consideration, and plaintiff is, of course, free to continue to pursue whatever remedies are available to it.
The judgment appealed from is affirmed.

The Recycling Tax imposed by N.J.S.A. 13:1E-95 is $1.50 per ton. The Closure Escrow Account mandated by N.J.S.A. 13:1E-109 is $1.00 per ton. The Solid Waste Service Tax imposed by N.J.S.A. 13:1E-138a is $.50 per ton. The Resource Recovery Investment Tax Fund imposed by N.J.S.A. 13:1E-I38b(1) is $1.00 per ton. In addition to this $4.00 per ton, the Sanitary Landfill Closure Tax imposed by N.J.S.A. 13:1E-104 requires payment of another $.15 per cubic yard. N.J.A.C. 14:11-7.8 provides a conversion factor of five cubic yards to one ton for residential solid waste and 3.3 to one for compacted waste. Averaging produces a conversion ratio of 4.15 to one. If we use this ratio for comparison purposes, the total of the five taxes per cubic yard is about $1.11.