## NOVEMBER TERM, 1866.

THE TIDE-WATER COMPANY, and others, appellants, and COSTER, respondent.*

1. For the purpose of reclaiming large tracts of lands, the rights of eminent domain and of taxation may be employed.

2. Whether a scheme of improvement be of such public utility as to justify a resort, for its furtherance, to the power of taxation and eminent domain, is a matter to be decided by the legislature.

3. By the charter of "The Tide-water Company," commissioners were to be appointed who were authorized to make a contract with such company, for the draining of large tracts of meadow land, the property of various

*CITED *in* 9 *C. E. Gr.* 469 ; 5 *Vr.* 229 ; *Id.* 242 ; 6 *Vr.* 211 ; *Id.* 501 ; 7 *Vr.* 57 ; *Id.* 293 ; *Id.* 447 ; 8 *Vr.* 422 ; 10 *Vr.* 434 ; *Id.* 581.

individuals, said commissioners being also empowered to assess upon said lands, when reclaimed, a just proportion of the contract price—*held*, that such scheme was illegal and void, inasmuch as the expense to be levied on the land was not limited in amount to the extent of the benefit to be conferred.

4. The cost of a public improvement may be imposed on the property peculiarly benefited; but the cost beyond this measure must be levied from the public at large.

5. To compel the owner of property to bear the expense of an improvement except to the extent of his particular advantage, is, *pro tanto*, to take private property for public use without compensation.

The opinion of the Chancellor is reported *ante p.* 55.

*Mr. Williamson* and *Mr. P. D. Vroom,* for appellants.

*Mr. Vanatta* and *Mr. McCarter,* for respondent.

The opinion of the court was delivered by
THE CHIEF JUSTICE.

The appellant, the Tide-water Company, is a corporation created by an act of the legislature, passed April fourth, 1866. The purpose for which this company was called into existence, was to assist in draining the tide-water marshes adjoining Newark bay and its tributary streams. The means by which this useful end was to be attained were, in the statutory language: "The construction, maintenance, and management, of suitable dykes, drains, ditches, dams, sluices, engines, pumps, and all other machinery, works, and structures, necessary or useful in the improvements required to fit said lands for occupancy and use, and for the maintenance of the drainage thereof." And with the view of providing these means, the corporation in question was formed, with a capital stock of $1,000,000. In addition to the organization of this incorporated body, the act authorizes the appointment, by a justice of the Supreme Court, of three commissioners, who are empowered to enter into a contract with the Tide-water Company for the performance of the work above specified; it being re-

quired, however, that before such contract should go into effect, it should be confirmed by a judge of the Supreme or Circuit Court. The direction for the raising and payment of this contract price is contained in the following clause: " That said commissioners, after making the contract provided for in the next preceding section of this act, and after the re-claiming of said lands, or any part thereof, shall have been completed according to said contract, shall assess upon the said lands so reclaimed a just proportion of the contract price, and of the expenses of said commission, and shall cause the same to be collected annually, and shall pay the stipulated compensation to said company." These assessments are also made liens upon the lands, respectively, and a sale is authorized in case of non-payment.

These are the general aspects of this statute, and for the purposes of this opinion it is not necessary to dwell on details.

Commissioners having been appointed, the Tide-water Company presented the outline of a contract to them for their consideration; and at this stage of the proceedings, further action was arrested by an injunction issued out of the Court of Chancery, founded on a bill filed by the respondents in this court, who are the owners of certain of the meadows to be affected by the act. A motion to discharge the injunction for want of merits in this bill having failed before the Chancellor, has given occasion for this appeal.

The injunction in the court below was issued and sustained upon the ground that the act of the legislature, to which reference has just been made, was unconstitutional. It is not now pretended that the judicial suspension of these proceedings is to be justified from any other consideration. The only question therefore to be resolved at the present time by this court is, as to the power of the legislature to enact the law which forms the basis of this controversy.

That the legislative authority is competent to effect the end provided for in this act, I can entertain no doubt. The purpose contemplated, is to reclaim and bring into use a tract

of land covering about one-fourth of the county of Hudson, and several thousand acres in the county of Union. This large district is now comparatively useless. In its present condition, it impairs very materially the benefits which naturally belong to the adjacency of the territory of the state to its navigable waters. It is difficult, from the great expense of such works, to build roads across it, and consequently it has heretofore interposed a barrier to anything like easy access, except by means of railroads, from one town to another situated upon its borders. To remove these evils and to make this vast region fit for habitation and use, seems to me plainly within the legitimate province of legislation ; and to effect such ends, I see no reason to doubt that both the prerogatives of taxation and of eminent domain may be resorted to. From the earliest times, the history of the legislation of this state exhibits many examples of the exercise of both these powers for purposes not dissimilar, and by these means, without question, many improvements have been effected. The principle is similar to that which validates the transfer by legislative authority, of private property to private corporations for the construction of railroads and canals, or the construction of sewers and streets, and the imposition of the expense on the lands benefited. It is the resulting general utility which gives such enterprises a kind of public aspect, and invests them with privileges which do not belong to mere private interests. I have no difficulty, therefore, in concluding that the legislature was fully authorized to adopt measures to accomplish the general · design embraced in this act, now under the consideration of this court.

Nor, in this connection, should it fail to be observed, that it is one of the legislative prerogatives to decide the important question, whether an enterprise or scheme of improvement be of such public utility as to justify a resort, for its furtherance, to the exercise of the power of taxation or eminent domain. Primarily, the judiciary has no concern in such matter. And not only this, but if the public interest be involved, to any substantial extent, and if the project con-

templated can, in any fair sense, be said to be promotive of the welfare or convenience of the community, the legislative adoption of such project is a determination of the question, from which there is no appeal, and over which no other branch of the government has any supervision whatever. Whether a road, a turnpike, a bridge, or a canal, will subserve public or private needs, are inquiries addressed exclusively to the law-making power, whose answer, according to the genius of our government, must be final and irreversible. This doctrine has been often propounded as the undoubted rule of law, by the most eminent elementary writers, and has received the sanction of much judicial adoption. "It undoubtedly must rest," says Chancellor Kent, "as a general rule, in the wisdom of the legislature, to determine when public uses require the assumption of private property." 2 *Kent's Com.* 340. In *Cottrill* v. *Myrick,* 3 *Fairfield* 222, it is remarked : "It rests with the legislature to judge of the cases which require the operation of the right of eminent domain, and it may be applied in cases of roads, turnpikes, railways, canals, ferries, bridges, &c., provided there be, in the assumption of the property, evident utility and reasonable accommodation as respects the public." And in *Beekman* v. *Saratoga and Schenectady Railroad Company,* 3 *Paige* 73, equally explicit upon this subject, is the language of Chancellor Walworth : "But if the public interest," such are the words of this enlightened jurist, "can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose. It is upon this principle that the legislatures of several of the states have authorized the condemnation of the lands of individuals for mill sites, where, from the nature of the country, such mill sites could not be obtained for the accommodation of the inhabitants, without overflowing the lands thus condemned. Upon the same principle of

public benefit, not only the agents of the government, but also individuals and corporate bodies, have been authorized to take private property for the purpose of making public highways, turnpike roads, and canals; of erecting and constructing wharves and basins; of establishing ferries; of draining swamps and marshes; and of bringing water to cities and villages." .

These citations embody, in my opinion, the correct and established principle, and, at the same time, illustrate the nature and define the extent of such principle. The legislative power is not competent to take the property of A and transfer it to B, simply for the benefit or convenience of B, because such an act has no public aspect; it concerns and affects, exclusively, the two individuals. In such case, it would be within the authority of the judiciary to pronounce such transfer unconstitutional and void. But if the sequestration of the property of A will, to a material extent, be serviceable to the public at large, whether such sequestration shall take place, must be committed, as a pure matter of discretion, to the legislature, provided such discretion be exercised in good faith, and does not rest, incontrovertibly, upon a false foundation. Applying this rule to the facts of the present case, it seems to me that no person can deny that the decision which the legislature has made, to the effect, that the project provided for in the act at present considered, is an authorized act of legislative authority, has in it elements of public utility, and that, consequently, this court has not the power to review such decision. A statute, authorizing the erection of a dyke at the public charge, for the purpose of protecting large sections of land within the state from the overflow of freshets or the reflux of the tide, would be universally acknowledged to be clearly within the bounds of legitimate legislation, and yet it is conceived the purpose of the present law is not, in its general character, dissimilar from such a public work. The object proposed, and for which provision is made in the statute under review, being, then, one tending to the benefit of the community at large, must be regarded, upon principles

which are too valuable to social interests to be disturbed, as coming exclusively under legislative control. The objection raised on this foundation in the argument, consequently, is not solid.

Nor have I been able to perceive much force in many of the topics of objection embraced in the arguments of counsel. One of the principal reasons urged why this act could not be enforced, was that it authorized the commissioners to pay to the company more than the expense of constructing the works and performing the labor, incident to the enterprise. It was insisted, that beyond such actual cost and expense, these officers, by force of this statute, could agree to pay to the corporation such sum as they saw fit; and that, as to such excess, the property of the land owner was taken from him without compensation. If this, in point of fact, be so, the conclusion of the counsel of the respondents would be indisputably logical; the act would be plainly unconstitutional. But upon looking at the provisions in question, no trace of such an authority can be perceived. The act empowers the commissioners to contract with the company for the construction and maintenance of the works; and provides that they "shall pay said company such annual compensation therefor, as such contract shall specify." But can it be reasonably pretended, that by virtue of such an authority the commissioners have the right to agree to give more than a fair compensation for the labor to be performed and the capital employed? If an agent be empowered, in general terms, to make a contract for his principal, can he righfully bind his principal to exorbitant terms? If he do so knowingly it would be a fraud; and, in the same way, these commissioners could not honestly stipulate to pay more than a fair price for that which they contract. It will be kept in mind that, with our present aim, the only question is, what is the extent of the authority in this respect conferred by the statute on these officials? What they may intend, or what the corporation may expect them to do, cannot, in the remotest degree, touch the point of the legislative power which is now before us. It may be true, as

was so forcibly urged on the argument, that it is the expectation of this corporation to effect an agreement with these commissioners, by force of which they would be entitled to an interest the extent of which will be contingent on the ultimate success of the enterprise and the consequent value of the lands reclaimed. I have no hesitation in saying, that in my opinion, any arrangement by which the compensation of the appellants, for the work to be contracted for, should be made to turn, in any degree whatever, on the future value of the lands, and which by any possibility could be in evident excess of the real cost of the works, would be illegal and void. Such an arrangement could not receive, as I think, judicial sanction under any circumstances, unless with the assent of all the owners of the land. The legislature would not be competent to authorize a contract of that description. This corporation must be regarded as a contractor to do the work incident to the enterprise in question ; and all that the commissioners could agree to pay would be the expenses, and a reasonable profit. They could not bind the land owners to pay more than this, no matter how valuable their property, by reason of this scheme to improve it, might turn out to be. If a speculative remuneration for the use of their money and labor is contemplated by the projectors of this scheme, they must utterly fail to carry it through by legislative assistance. For I think it beyond question, that such a plan cannot be forced upon any owner of property against his will. A compact between the land proprietors and capitalists, whereby the latter should undertake the expense and risk of the improvement of the land for a stipulated return, to be graduated, not so much by the actual expenditure as the anticipated increase in value of the lands, might be very reasonable in itself, and mutually beneficial ; but it is a compact to which the assent of the land owner is indispensable ; and if, under this law, the commissioners should take upon themselves to enter into an agreement of this character with the Tide-water Company, I cannot but think it would be pronounced to be void as soon as it should be brought to the cognizance of the courts.

But in the act in question, nothing is perceived which appears to lend countenance to the formation of such a contract, and as has been before remarked, it is of no consequence to the present inquiry, what the expectations of these corporators may be. This statute, in my opinion, does not warrant any contract, by force of which the corporation shall be entitled to receive anything more than a fair equivalent for the work and money expended; and, consequently, I am unable to hold it void on the ground above suggested, that it permits the commissioners to agree for a payment unlimited in extent, and in excess of such equivalent.

Nor do I perceive any constitutional objection in the mode prescribed by which the company is authorized to condemn lands necessary for the successful prosecution of the undertaking. Such mode is not unlike that which is usually found in the charters of railroad companies, and appears to be unobjectionable in all respects. Much was said on the argument with regard to the great damage which many of the land owners would suffer in consequence of the works and embankments of the company cutting off the water fronts of their lands, and the consequent loss of riparian rights; but if such rights exist, for these and all other damages of a similar kind the act provides full compensation. As to the circumstances that the corporators are strangers, and uninterested in these lands; that no oath is required of the commissioners; that it will be difficult for these officers to estimate the cost of the original works, and the expense of maintaining them; and a multitude of similar incidents, I pass by without comment; for they obviously relate to the policy and not to the validity of the law, and whatever weight they may have been entitled to in legislative deliberations, they can exert no influence whatever over the decision of this court.

But looking more closely into the structure and effect of this statute, there appears to be a defect which seems to be both radical and incurable, and which must prevent its judicial enforcement. The defect alluded to is this: no provision is made for the indemnification of the owner of the land

subjected to the operation of this law, in case the expense of the improvement shall exceed the benefits which shall be conferred. The act authorizes the entire expense of drainage to be imposed upon the lands, whether such expense falls below, or rises above, the increase in value which may accrue to the lands by reason of such drainage. In other words, the cost of the enterprise is to be imposed as a burthen on the lands, even though a full equivalent in the way of improvement, shall not be given to the land owner. Thus, if the cost of drainage should be $5 an acre, such sum is to be assessed on the land, although such land may not be benefited more than to the extent of $3 an acre. The statute does not require that the apportionment of expense shall be limited, as the maximum rate, by the increase in the value to result from the improved condition of the land. Now, therefore, it seems to me obvious, that if this scheme be carried into effect, in the event of an excess of expenses over benefits, private property, *pro tanto*, will be taken for public use without compensation. Where lands are improved by legislative action, on the ground of public utility, the cost of such improvement, it has been frequently held, may, to a certain degree, be imposed on the parties who, in consequence of owning lands in the vicinity of such improvement, receive a peculiar advantage. By the operation of such a system, it is not considered that the property of the individual, or any part of it, is taken from him for the public use, because he is compensated in the enhanced value of such property. But it is clear this principle is only applicable when the benefit is commensurate to the burthen; when that which is received by the land owner is equal or superior in value to the sum exacted; for if the sum exacted be in excess, then to that extent, most incontestably, private property is assumed by the public. Nor, as to this excess, can it be successfully maintained that such imposition is legitimate as an exercise of the power of taxation. Such an imposition has none of the essential characteristics of a tax. We are to bear in mind that this projected improvement is to be regarded

as one in which the public has an interest; the owners of these waste lands have a special concern in such improvement, so far as their lands will be in a peculiar manner benefited; beyond this, their situation is the same as that of the rest of the community. The consideration for the excess of the cost of the improvement over the enhancement of the property, within the operation of this act, is the public benefit : how, then, upon any principle of taxation, can this portion of the expense be thrown exclusively upon certain individuals ? The expenditure of this portion of the cost of the work can only be justified on the ground of benefit to the public. I am aware of no principle which will permit the expenses incurred in conferring such benefit upon the public, to be laid in the form of a tax upon certain persons, who are designated, not indeed by name, but by their description as the owners of certain lands. A legislative act authorizing the building of a public bridge, and directing the expenses to be assessed on A, B, and C, such persons not being in any way peculiarly benefited by such structure, would not be an act of taxation, but a condemnation of so much of the money of the persons designated, to a public use. And, precisely in the same way, would an exaction of the cost of these works embraced in the act before us, so far as such cost exceeded the benefit to the lands improved, be an assumption of the money of a few individuals for an end purely public. Nor should it be overlooked, that if the scheme embraced in this act should be put in operation, and the expenses should exceed or equal the value of the land in its reclaimed condition, the inevitable result would be, that the public would acquire the benefits contemplated by the rescue of the land from its present idleness, but the owner of the land would lose his entire property. Every consideration of equity stands opposed to the admission of such a rule of taxation. Nor do I consider it any answer to this last objection, to suggest that there is no probability that the expenses of this improvement will equal the improved value of the land to be affected by it. It is clear, that the

The Tide-water Company v. Coster.

cost of the work and the value of the land in its altered condition, are not easy of estimation; it is certain, many enterprises of a similar character have proved abortive, and have brought great losses upon their projectors; and it is enough, therefore, to say, that the property owner cannot, without his consent, be made a party in the hazards of such an enterprise. If the assessment to which he is subjected had been restricted so as not to exceed the benefits received by him, he would have run no risk, because he could not have suffered any loss; but as this law is framed, his land may be taken from him, if the expenses of the project require the sacrifice. This, as has been already stated, would be, in my opinion, equivalent to a condemnation of the land, without compensation, for the public benefit, and as this may result from the natural operation of the statute, I am compelled to conclude that it is unconstitutional and void.

Thus far, this subject has been treated on general principles, and the deduction which has been drawn rests on those ordinary rules of justice which, to a considerable degree, form the basis of the social compact; but the result in this way attained has, it is conceived, the great weight of authority in its favor. In the *Matter of Canal Street*, 11 *Wend.* 154, Chief Justice Savage, referring to a proceeding to open a street in the city of New York, says: "If the assessment is confirmed and enforced, the owners of the adjacent property must pay beyond the enhanced value of their own property, *and all such excess is private property taken for public use without just compensation.*"

The following adjudications are also in point in support of the doctrine that, in proceedings to effect public improvements, the assessment of expenses on the property in the locality of such improvement, must not exceed the value of the benefit conferred upon the land owner. *Matter of Fourth Avenue*, 3 *Wend.* 452; *Matter of Albany Street*, 11 *Ibid.* 149; *Matter of William and Anthony Street*, 19 *Ibid.* 678; *Matter of Flatbush Avenue*, 1 *Barb. S. C. R.* 286; *Nichols* v. *City of Bridgeport*, 23 *Conn.* 204.

The same view has likewise, I think, been recognized and approved by the Supreme Court of this state. In *The State* v. *Mayor, &c., of Newark,* 3 *Dutcher* 185, two questions were presented; first of which was, whether an assessment made under the charter of the city of Newark, on certain houses and lots owned by the New Jersey Railroad and Transportation Company, for their share of the expense of altering and widening a street, was an imposition upon the company, within the meaning of the exemption from taxation contained in their act of incorporation. The assessment had been made as required by the municipal charter, among the owners of the houses and lots intended to be benefited by the improvement, in proportion to the advantage each had acquired. This assessment was held legal. In the opinion of Chief Justice Green, some of the decisions before referred to are cited with apparent satisfaction, and the doctrine that the assessment, in order to be legal, must not exceed the value of the benefits to the land owner, is adopted. "The theory," says this opinion, "upon which such assessments are sustained, as a legitimate exercise of the taxing power, is that the party assessed is locally and peculiarly benefited over and above the ordinary benefit which, as one of the community, he receives in all public improvements, to the precise extent of the assessment. If the assessment made upon the railroad company is to be regarded as an exercise of the power of taxation, without reference to the special benefit conferred upon the company, then clearly the assessment is illegal." And in the same case Mr. Justice Elmer, laying down the same rule, cites and places himself upon a similar train of authorities. "In the case of the *Canal Bank* v. *Mayor of Albany,* 9 *Wend.* 244, and in the *Matter of Albany Street,* 11 *Wend.* 151, the Supreme Court of New York," such is his language, "treat an assessment of property benefited by an improvement, made for the public use, as a taking of property for public use, and hold that the amount assessed must not exceed the benefit actually received." It will be observed, therefore, that the principle upon which *The State* v. *Mayor, &c., of Newark,* and the other cases referred to,

The Tide-water Company *v.* Coster.

are founded, is the same which has been taken as the guide in the present investigation. That principle is one of great importance ; for if the burthens of the community can be thrown upon a small class, whose position is not peculiar or different from that of the rest of the people, there can be no security for private possessions. To permit individuals to be taxed to pay for a public improvement to the extent of the peculiar benefit which they receive from such improvement, is not unjust or inequitable ; but any exaction beyond this, exclusively from such individuals, is an act which involves the ability, on the part of the community, to confiscate, for its own purposes, the property of the citizen. Such power has not, by the constitution of this state, been placed in the hands of the legislature ; and as the act in question has, in the particular adverted to, exercised such power, it is in my opinion void.

Before closing this subject it should be remarked, that this case, with regard to the grounds on which it rests, is to be distinguished from that class of proceedings by which meadows and other lands are drained on the application of the land owners themselves. In the present instance, the state is the sole actor, and public necessity or convenience is the only justification of her intervention. But the regulations established by the legislative power, whereby the owners of meadow lands are compelled to submit to an equal burthen of the expense incurred in their improvement, are rules of police of the same character as provisions concerning party walls and partition fences. To these cases, therefore, the principle upon which the decision of the present case rests, is not to be extended. The decree of the Chancellor should be sustained.

The decree was affirmed by the following vote :

*For affirmance*—BEASLEY, C. J., BEDLE, CLEMENT, DALRIMPLE, DEPUE, ELMER, FORT, KENNEDY, VREDENBURGH, WALES, WOODHULL. 11.

*For reversal*—NONE.