
# IN THE SUPREME COURT OF GUAM

**IN RE: WESTERN SALES TRADING COMPANY,**
Petitioner-Appellee,

**v.**

**GENPRO INTERNATIONAL, INC. (GUAM),**
Respondent-Appellant,

**and**

**FPD FOOD INTERNATIONAL INC.,**
**a.k.a. 7D Food International, Inc.,**
Real Party in Interest-Appellee.

Supreme Court Case No.: CVA19-023
Superior Court Case No.: SP0058-18

## OPINION

**Cite as: 2021 Guam 7**

Appeal from the Superior Court of Guam
Argued and submitted on May 27, 2020
Via Zoom video conference

Appearing for Respondent-Appellant:
Bill R. Mann, *Esq.*
Berman O'Connor & Mann
Bank of Guam Bldg.
111 Chalan Santo Papa, Ste. 503
Hagåtña, GU 96910

Appearing for Petitioner-Appellee:
Joseph C Razzano, *Esq.*
Joshua D. Walsh, *Esq.* (argued)
Edwin J. Torres, *Esq.*
Razzano Walsh & Torres, P.C.
139 Murray Blvd., Ste. 100
Hagåtña, GU 96910


**E-Received**
7/28/2021 12:22:46 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; KATHERINE A. MARAMAN, Associate Justice; JOSEPH N. CAMACHO, Justice *Pro Tempore*.

**MARAMAN, J.:**

[1]     Dried mangoes form the core of this commercial dispute, which involves a Fifth Amendment challenge to Guam's "Protection Against Recalcitrant Judgment Debtors" statute. *See* 7 GCA §§ 23401-23406 (added by Guam Pub. L. 34-077:2 (Feb. 9, 2018)).  The Fifth Amendment to the United States Constitution and the Organic Act of Guam prohibit the taking of private property for public use without just compensation.  U.S. Const. amend. V; 48 U.S.C.A. § 1421b(f), (u) (Westlaw through Pub. L. 117-26 (2021)).  Title 7 GCA §§ 23401-23406 ("turnover statute") permit a judgment creditor to take property from a third party who acquired assets from a judgment debtor.  Respondent-Appellant Genpro International, Inc. (Guam) ("Genpro") appeals an order of the Superior Court commanding it to turn over dried mangoes it purchased from Real Party in Interest-Appellee FPD Food International Inc. ("FPD Food"), a.k.a. 7D Food International, Inc. ("7D Food"), to Petitioner-Appellee Western Sales Trading Company ("WSTCO").  The Superior Court entered the turnover order under 7 GCA § 23404, and it was premised on a default judgment WSTCO obtained against 7D Food.

[2]     On appeal, Genpro argues that the turnover statute violates the Takings Clause of the Fifth Amendment because it confiscates Genpro's property to pay another person's debt.  WSTCO argues that the turnover statute is not a taking, but even if it is, it satisfies both the "public use" and "just compensation" requirements of the Takings Clause.  WSTCO also challenges this court's jurisdiction, because the Superior Court did not enter judgment on a separate document.  We deny WSTCO's motion to dismiss, conclude that the turnover statute

violates the Fifth Amendment and the Organic Act, reverse the judgment of the Superior Court, and remand with directions to dismiss the special proceeding.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[3]     7D Food, a Philippine corporation, entered into a distribution contract with WSTCO, a Guam corporation, giving WSTCO the exclusive right to distribute 7D Dried Mangoes in Guam. After a series of disputes and negotiations, 7D Food cancelled the distribution agreement with WSTCO.  Following the termination, WSTCO sued 7D Food—alleging an unjustified cancellation—and obtained a default judgment of $972,264.54 against 7D Food.  During this time, FPD Food became a successor corporation to 7D Food.[1]  Despite its best efforts, WSTCO has not been able to collect on its judgment against 7D Food.

[4]     Genpro imports products from the Philippines, including 7D Dried Mangoes, for resale to retailers in Guam.  After Genpro acquired some of its 7D Dried Mangoes from FPD Food, WSTCO filed a petition under 7 GCA § 23402 for an order to show cause why a turnover order should not be issued.  In opposing the Petition, Genpro requested the Superior Court dismiss the Petition, arguing that the turnover statute violates the Takings and Contracts clauses of the Constitution and Organic Act of Guam and that WSTCO failed to join FPD Food as an indispensable party.  The Superior Court overruled all of Genpro's objections and, on April 26, 2019, issued an order granting WSTCO's petition for an order to show cause and set the matter for a show cause hearing.  This order was entered on the docket on April 29, 2019.  Before the hearing on the order to show cause, WSTCO moved to hold Genpro in contempt for violating the

---

[1]  Whether FPD Food was, in fact, a successor corporation to 7D Food was disputed in the Superior Court. On appeal, Genpro explicitly does not challenge this finding to focus on its constitutional claims.  Appellant's Br. at 4-5 (Dec. 18, 2019).

court's "turnover order." Record on Appeal ("RA"), tab 35 at 1-6 (Mot. Hold Genpro in Contempt, June 14, 2019).

**[5]** On October 22, 2019, the Superior Court issued a turnover order but also denied WSTCO's motion for contempt, finding that its April 26, 2019 order was merely an order to show cause and not a turnover order itself. The October 22, 2019 order commanded Genpro to turn over the dried mangoes based on similar reasons in the earlier order to show cause. The October 22, 2019 order also gave Genpro a lien over the dried mango sales proceeds based on the cost of acquiring the product from FPD Food. On October 28, 2019, Genpro filed its notice of appeal of the October 22, 2019 order. No separate document containing a final judgment was ever filed or entered on the docket. The Superior Court did enter Findings of Fact and Conclusions of Law regarding the amount of a supersedeas bond on December 12, 2019.

**[6]** In this court, WSTCO moved to dismiss the appeal, arguing that we lack jurisdiction because the Superior Court did not enter a separate judgment and Genpro failed to timely appeal from the April 26, 2019 order. Genpro opposed the motion, and we took the motion with the case.

## II. JURISDICTION

**[7]** The parties dispute our jurisdiction to hear this appeal. This court has jurisdiction over an appeal from a final judgment of the Superior Court. 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-27 (2021)); 7 GCA §§ 3107, 3108(a) (2005).

**[8]** In WSTCO's view, we lack jurisdiction over Genpro's appeal for two reasons. First, WSTCO argues we cannot hear the case because the Superior Court did not enter a judgment on a separate document. Second, WSTCO alleges that even if no separate document is required,

Genpro failed to appeal from the operative final decision and order, the April 26, 2019 order. Based on our prior precedent, we find WSTCO's arguments to be without merit.

[9]     WSTCO argues the Superior Court's April 26, 2019 order—granting WSTCO's petition for an order to show cause why a turnover order should not issue against Genpro—is the operative final decision.  As a factual matter, the April 26, 2019 order was not a final decision. As the Superior Court observed, the April 26, 2019 order was not a turnover order itself, but merely an order to show cause, which set the matter for a future hearing.  An order to show cause is appealable only if the order constitutes a final judgment, final decree, or final order of the Superior Court.  *Marriott v. Marriott*, 2014 Guam 28 ¶ 9.  An order that is not a final judgment, final decree, or final order of the Superior Court is reviewable on appeal from a final judgment or other final appealable order.  *See* 7 GCA § 3107; *Duenas v. George & Matilda Kallingal, P.C.*, 2013 Guam 28 ¶ 15; *see also Peterson v. Schulz*, 2017 ND 155, ¶ 10, 896 N.W.2d 916, 920 ("An order to show cause is not a final appealable order.  However, most non-appealable intermediate orders may be reviewed on an appeal from the final judgment or other final appealable order."). Because the April 26, 2019 order was only a show cause order, it was not final.  As the order to show cause merged with the final order or judgment, we may now review the interlocutory order in this appeal.  *See, e.g.*, *Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.*, 393 F.2d 441, 444 (2d Cir. 1968) ("Since all interlocutory orders and decrees are merged into the final order of the district court, they may be reviewed on the appeal." (internal citation omitted)).

[10]     Because there is not a separate document judgment, we now discuss when the final judgment was "entered" in the Superior Court.  After the show cause hearing, the Superior Court entered an order on October 22, 2019, requiring Genpro to turn over to WSTCO the dried mangoes it acquired from FPD Food.  This order resolved the issues between the parties, except

for the amount of a supersedeas bond. Because a supersedeas bond is generally a collateral issue, it does not weigh on whether the October 22, 2019 order finally resolved the issues between the parties. *See, e.g.*, *Koster & Wythe v. Massey*, 262 F.2d 60, 62 (9th Cir. 1958). Nonetheless, the Superior Court entered a Findings of Fact and Conclusions of Law resolving the bond amount on December 12, 2019. Regarding these documents, we agree with WSTCO's point that neither the October 22, 2019 order nor the December 12, 2019 order was immediately appealable as a judgment because there was no separate document. *See* Guam R. Civ. P. 58(a)-(b). However, this does not mean there is no judgment here.

[11]    Where no separate document has been entered, the Guam Rules of Civil Procedure define entry of judgment as occurring "when 150 days have run from entry in the civil docket under Rule 79(a)." Guam R. Civ. P. 58(b)(2)(B); *see also* Guam R. App. P. 4(a)(7)(B)(ii) (defining entry of judgment under separate document rule as including when 150 days have run from entry of judgment or order in civil docket). Under our precedent, we treat a judgment as effectively entered 150 days after the document or order disposing of all the claims between the parties has been entered on the docket. *See Guam Police Dep't v. Guam Civil Serv. Comm'n (Charfauros)*, 2020 Guam 12 ¶ 7; *Portis Int'l, LLC v. Marquardt*, 2018 Guam 22 ¶ 9; *Rapadas v. Benito*, 2011 Guam 28 ¶ 9; *Quijano v. Atkins-Kroll, Inc.*, 2008 Guam 14 ¶¶ 5-6. For purposes of the 150-day rule, we look for an order that "disposes of the entire case by determining the rights of the parties in an action." *Portis Int'l*, 2018 Guam 22 ¶ 5 (quoting *Sharrock v. McCoy*, 2016 Guam 7 ¶ 39).

[12]    As discussed above, the order entered October 22, 2019, is the order disposing of the entire case. This order actually required Genpro to turn over the dried mangoes to WSTCO. Therefore, under the 150-day rule, judgment was effectively entered on March 20, 2020. *See Charfauros*, 2020 Guam 12 ¶ 7; *see also* Guam R. App. P. 4(a)(2) ("A notice of appeal filed after

the court announces a decision or order -- but before entry of the judgment or order -- is treated as filed on the date of and after the entry."); Guam R. App. P. 4(a)(7)(B)(ii). We conclude we have jurisdiction and deny WSTCO's motion to dismiss.

## III. STANDARD OF REVIEW

[13]    "The constitutionality of a statute is a question of law reviewed *de novo*." *Guam Greyhound, Inc. v. Brizill*, 2008 Guam 13 ¶ 6 (quoting *People v. Perez*, 1999 Guam 2 ¶ 6, *overruled on other grounds by People v. Shimizu*, 2017 Guam 11).

## IV. ANALYSIS

[14]    The United States Supreme Court has held that the Takings Clause applies to both real and personal property, including dried fruits. *Horne v. Dep't of Agric.*, 576 U.S. 350, 357-58 (2015). Protection against the taking of agricultural products extends at least as far back as the Magna Carta. *Id.* at 358 (citing Magna Carta, Cl. 28 (1215), in W. McKechnie, *Magna Carta, A Commentary on the Great Charter of King John 329* (2d ed. 1914)). On this backdrop, we address the central question in this case: whether the turnover statute violates the Takings Clause of the Fifth Amendment and the Organic Act by allowing a judgment creditor to satisfy a judgment by taking a third party's property acquired from the judgment debtor.[2] We conclude that where a statute enacts such a transfer from one private party to another without satisfying the "public use" and "just compensation" requirements, it is unconstitutional and inorganic.

---

[2] Genpro challenges the turnover statute under the Takings Clause of both the Fifth Amendment and the Organic Act of Guam. While the Takings Clause of the Organic Act varies slightly from the Fifth Amendment, the difference is not substantial. Where the Constitution and Organic Act share substantially similar language, we interpret the provisions the same. *See Guam Greyhound, Inc. v. Brizill*, 2008 Guam 13 ¶ 16; *see also People v. Moses*, 2016 Guam 17 ¶¶ 17-22. Additionally, as the Fifth Amendment is fully applicable to Guam, 48 U.S.C.A. § 1421b(u) (Westlaw through Pub. L. 117-26 (2021)), it would control over the Organic Act to the extent the Organic Act provides lesser protections.

**[15]**    In explaining our reasoning, we approach the issue in two parts.  First, we address whether the Takings Clause is implicated.  That is, we first discuss whether the turnover statute enacts a taking of private property by the government.  Concluding that the turnover statute does involve a taking, we then turn to the second question: whether the statute violates the Takings Clause.  As explained below, we conclude that the turnover statute violates the Takings Clause, as it fails the "public use" and "just compensation" requirements of the clause.  Guam's "Protection Against Recalcitrant Judgment Debtors" statute, 7 GCA §§ 23401-23406, therefore, is unconstitutional and inorganic.

**A.  Title 7 GCA §§ 23401-23406 Facilitates a Government Taking**

**[16]**    Genpro argues the turnover statute is a government taking because the government is compelling it to turn over its private property, dried mangoes, to WSTCO.  In WSTCO's view, which was adopted by the Superior Court, the turnover statute does not involve a taking because the statute is merely a judgment debtor collection law, and the government is not the ultimate owner of the property.  WSTCO argues there is no "state action," thus the Takings Clause is not implicated.  We disagree.

**[17]**    In certain constitutional contexts, such as Equal Protection cases, the state action requirement dictates that a government actor must directly cause the alleged constitutional violation for a Takings Clause claim to be actionable.  *See, e.g.*, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721-23 (1961) (discussing the "state action" requirement).  Many Takings Clause cases involve situations where the government takes title to the property and uses it for its own purposes.  *See, e.g.*, *Shoemaker v. United States*, 147 U.S. 282 (1893).  While the Takings Clause applies when the government takes property for its own use, it is not confined to this scenario.

[18]    The government-mediated realignment of property rights—legislatively or judicially—between private parties is subject to the Fifth Amendment's limits on takings.  *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 601-02 (1935); *see also United States v. Sec. Indus. Bank*, 459 U.S. 70, 75-78 (1982).  A government taking implicating the Takings Clause does not depend on state action vis-à-vis "government ownership."  Cases such as *Berman v. Parker*, 348 U.S. 26 (1954), *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984), and *Kelo v. City of New London*, 545 U.S. 469 (2005), make evident that the Takings Clause may be implicated regardless of the ultimate destination or owner of the property.  Supreme Court jurisprudence regarding the Takings Clause has repeatedly involved realigning property interests between private parties.  In *Berman*, owners of building structures in blighted areas were forced to transfer property to a private entity—the District of Columbia Redevelopment Land Agency—for redevelopment.  348 U.S. at 33-34.  In *Midkiff*, single-family residential lots were condemned by Hawaii for resale to residential tenants to diversify ownership of lands in the state.  467 U.S. at 241-42.  In *Kelo*, private homeowners had their property condemned by a private economic redevelopment agency to be transferred to a large corporation.  545 U.S. at 472.  The Takings Clause was implicated because mechanisms of government were used to take a person's private property, regardless of the public or private identity of the final owner.

[19]    The government has the power to effect contractual commitments between private parties through legislative schemes.  *E. Enters. v. Apfel*, 524 U.S. 498, 528 (1998).  Effecting contractual commitments and property does not always constitute a taking.  Supreme Court jurisprudence has rarely drawn fine lines defining per se takings.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); *In re Davis*, 539 B.R. 334, 345 (Bankr. S.D. Ohio 2015).  The Supreme Court has defined two categories as per se takings: "regulations that compel the property owner

to suffer a physical 'invasion' of his property," and "regulation[s] den[ying] all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015; *In re Davis*, 539 B.R. at 345. Outside of these two categories, a taking may still occur. The Supreme Court has defined a number of factors to assess such as "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979). A traditional taking occurs when the government physically takes or redistributes property, though it may also occur in the form of a public program redistributing benefits and burdens for the common good. *E. Enters.*, 524 U.S. at 522 (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

[20]     Consistent with its legislative powers, the government may regulate or restrict a person's use of or ability to sell personal property, and doing so does not always create a taking. *See, e.g.*, *Andrus v. Allard*, 444 U.S. 51, 55-66 (1979) (holding Takings Clause was not implicated when Congress prohibited sale of eagle feathers, as reduction in value of property is not necessarily a taking). When, however, a person's property is physically taken, the Takings Clause is implicated. *See, e.g.*, *Horne*, 576 U.S. at 363-64 (holding that when government requires "physical surrender" of personal property, there is a taking subject to Fifth Amendment review). The government may, when consistent with its legislative powers, regulate and restrict the use of personal property; however, it may not physically possess or compel the transfer of property without implicating the Takings Clause. *See id.* at 364 ("A regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking . . . ."). In the case before us, the government is not merely restricting what Genpro may do with its dried mangoes; it is compelling the physical surrender of the mangoes to WSTCO.

[21]    Article 4, Protection Against Recalcitrant Judgment Debtors, was added to Guam's Execution of Judgment in Civil Actions Chapter in 2018. 7 GCA §§ 23401-23406 (added by P.L. 34-077:2 (Feb. 9, 2018)). This turnover statute permits a judgment creditor to take property from a third party who acquired assets from a judgment debtor. *Id.* Title 7 GCA § 23403(a) permits one to obtain assets from a third party, facilitated by the government, authorizing a judgment creditor to seek a turnover order "when the assets that are sought are not in the possession of the judgment debtor himself," thus compelling "any person who holds the assets of the judgment debtor to turn over those assets. Guam courts are hereby authorized to issue a 'delivery order' or 'turnover order.'" *Id.*

[22]    The turnover statute permits the government facilitation of taking property from one private entity, without their consent, and reallocating that property to another. Failure of a party to comply is punishable as contempt of court. 7 GCA § 23403(b) ("With respect to a person who holds the assets of the judgment debtor, a Guam court may issue an order requiring any person to deliver any such assets, or to convert said assets to money for payment of the judgment. The court shall require any person to turn over the assets, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor. Disobedience of a turnover order is contempt of court and punishable as such.").

[23]    Given the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental turnover action (i.e., government involvement in redistribution of property), the Takings Clause is implicated.

[24]    Because the turnover statute involves the physical surrender of property at the direction of the government, it implicates the Fifth Amendment and Organic Act, and we must determine whether this taking comports with the constitutional requirements of the Takings Clause.

**B. The Turnover Statute Violates the Takings Clause and Is Inorganic and Unconstitutional Because it Fails to Satisfy the "Public Use" and "Just Compensation" Requirements**

[25]     Having determined that the turnover statute creates a taking, we must now turn our attention to whether it comports with the constitutional requirements of the Takings Clause.  A taking violates the Fifth Amendment and the Organic Act unless such taking is for public use and just compensation is paid.  U.S. Const. amend. V; 48 U.S.C.A. § 1421b(f).  We conclude the turnover statute is unconstitutional and inorganic because it authorizes government takings, such as the taking in this case, that fail to satisfy both requirements of the Takings Clause.

**1.  The turnover does not satisfy the "public use" requirement**

[26]     Under United States Supreme Court precedent, the "public use" requirement is satisfied when property is taken for public use, a public purpose, or a public benefit.  *See Midkiff*, 467 U.S. at 245 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.");  *Kelo*, 545 U.S. at 477-80 ("[T]he City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party."); *see also Kelo*, 545 U.S. at 497-99 (O'Connor, J., dissenting); *Gov't of Guam v. 162.40 Square Meters of Land*, 2011 Guam 17 ¶ 16 ("*162.40 Square Meters I*").  The 'public use' requirement of the Takings Clause allows the government to carry out takings for the sake of economic good so long as the taking is not adopted to benefit solely a particular class of private individuals.  *See Kelo*, 545 U.S. at 478; *see also Midkiff*, 467 U.S. at 245.  A purely private taking, even with just compensation, is unconstitutional.  *See Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55, 80 (1937).

[27]     There is no rigid formula defining "public use."  *See Kelo*, 545 U.S. at 483.  Public use may include a wide variety of enterprises, such as: cable television, *see, e.g.*, *Loretto v.*

*Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); reservoirs, *see, e.g.*, *Brown v. United States*, 263 U.S. 78 (1923); electric utilities, *see, e.g.*, *Mt. Vernon-Woodberry Cotton Duck Co. v. Ala. Interstate Power Co.*, 240 U.S. 30 (1916); irrigation systems, *see, e.g.*, *Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112 (1896); boardwalks, *see, e.g.*, *City of Blaine v. Feldstein*, 117 P.3d 1169, 1172 (Wash. Ct. App. 2005); government buildings, *see, e.g.*, *United States v. Certain Real Estate Lying on the S. Side of Broad St.*, 217 F.2d 920, 924 (6th Cir. 1954); and roads, *see, e.g.*, *Cnty. of Hawai'i v. C & J Coupe Fam. Ltd. P'ship*, 198 P.3d 615, 643 (Haw. 2008). Public use may encompass property taken for widespread public benefit such as restoration of blighted areas, *see, e.g.*, *Berman*, 348 U.S. 26, dismantling oligopolies of extreme wealth, *see, e.g.*, *Midkiff*, 467 U.S. 229, and allowing states and municipalities to engage in economic development, *see, e.g.*, *Kelo*, 545 U.S. 469.

[28]    While a wide range of projects have been upheld as "public use," the benefit must extend beyond particular individuals or certain estates. *Coster v. Tide Water Co.*, 18 N.J. Eq. 54, 68 (Ch. 1866), *aff'd*, 18 N.J. Eq. 518 (1866). A purely private benefit, or one that benefits only a small group, does not fall within the "public use" requirement of the Takings Clause. *See, e.g.*, *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922) ("But usually in ordinary private affairs the public interest does not warrant much of this kind of interference. A source of damage to such a house is not a public nuisance even if similar damage is inflicted on others in different places. The damage is not common or public."); *Mo. Pac. Ry. Co. v. Nebraska ex rel. Bd. of Transp.*, 164 U.S. 403, 417 (1896) (holding the taking unconstitutional as "it, was, in essence and effect, a taking of private property of the railroad corporation for the private use of the petitioners").

[29]    Guam's turnover statute does not appear to benefit the public but instead is tailored to provide a benefit to select private individuals. The statute involves a purely private transfer

mediated by the government.  It takes private property from one entity and transfers it to another private party for that private party's use, sale, and profit.  This is one of the evils the Takings Clause was designed to prevent.  "A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."  *Midkiff*, 467 U.S. at 245.  Such is the case before us.

[30]     We recognize the general iniquity the turnover statute seeks to prevent.  It is intended to aid judgment creditors when a judgment debtor attempts to escape their debt by placing their assets with a third party, outside of the reach of the judgment creditor.  *See* 7 GCA §§ 23402-23406.  While there is a benefit generally to preventing judgment debtors from escaping their debts, and such evil may foreseeably happen to multiple individual entities, the actual benefit of the turnover statute is bestowed upon too discrete of a set of individuals to constitute "public benefit."

[31]     The turnover statute is unconstitutional and inorganic as it does not provide a general public benefit, thus failing the "public use" requirement.  The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see also Gov't of Guam v. 162.40 Square Meters of Land*, 2016 Guam 10 ¶ 11 ("*162.40 Square Meters II*").  The Takings Clause permits a taking only when the government "actually uses or gives the public a legal right to use the property."  *Horne*, 576 U.S. at 370-71 (Thomas, J., concurring) (quoting *Kelo*, 545 U.S. at 521).  The confiscation of Genpro's dried mangoes does not serve a public purpose.  Both Genpro and WSTCO would sell the mangoes to consumers at market price.  The confiscated mangoes were not taken for public benefit, nor are the proceeds going to the government for public use.  The ultimate goal of the turnover statute is

to benefit private judgment creditors. Thus, the turnover statute is unconstitutional and inorganic because it fails the "public use" requirement of the Takings Clause.

### 2. The turnover statute does not satisfy the "just compensation" requirement

[32]    Even assuming for the sake of argument that the turnover statute satisfies the "public use" requirement of the Takings Clause, it is still unconstitutional and inorganic because it fails to provide "just compensation." Just compensation must be paid for the taking of private property for public use to avoid a single party from bearing the costs and burdens that should be paid by the benefitting public. *Armstrong*, 364 U.S. at 49. Even from the time of the Magna Carta, just compensation for agricultural products—often taken to feed the military—must be tendered in cash before confiscation. *Horne*, 576 U.S. at 358-59.

[33]    "[J]ust compensation includes all elements of value that inhere in the property . . . ." *Silver Creek Drain Dist. v. Extrusions Div., Inc.*, 663 N.W.2d 436, 442 (Mich. 2003) (quoting *United States v. Twin City Power Co.*, 350 U.S. 222, 235 (1956) (Burton, J., dissenting)). As the U.S. Supreme Court explained:

> [T]he question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken; and when by the taking of the tangible property the owner is actually deprived of the franchise to collect tolls, just compensation requires payment, not merely of the value of the tangible property itself, but also of that of the franchise of which he is deprived.

*Monongahela Navigation Co. v. United States*, 148 U.S. 312, 343 (1893).

[34]    It is well recognized that just compensation is calculated by the fair market value of the property on the date of its appropriation. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984); Christopher Serkin, *The Meaning of Value: Assessing Just Compensation for Regulatory Takings*, 99 Nw. U. L. Rev. 677, 683 (2005). "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the

taking." *Kirby Forest*, 467 U.S. at 10 (quoting *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979)). The fair market value is an objective standard. *See United States v. 50 Acres of Land*, 469 U.S. 24, 35 (1984) ("[J]ust compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner."); *see also Olson v. United States*, 292 U.S. 246, 255-56 (1934) ("Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined.").

[35]      If payment of just compensation is not made at the time of the taking, a just rate of interest must also be paid. *See Kirby Forest*, 467 U.S. at 10; *162.40 Square Meters II*, 2016 Guam 10 ¶ 13 ("[I]f disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." (alteration in original) (quoting *Kirby Forest*, 467 U.S. at 10)); *State by Spannaus v. Carney*, 309 N.W.2d 775, 776 (Minn. 1981) ("We have long recognized that interest on a condemnation award from the time of the taking of possession until the time of payment is an element of just compensation.").

[36]      The turnover statute does not satisfy the just compensation prong of the Takings Clause. The lien formula sets compensation as the "cost in acquiring the assets." 7 GCA § 23404(b)(1). The formula setting compensation at "the purchase price of the turnover property," 7 GCA § 23404(b)(3), is not just compensation. The lien formula does not provide an interest rate for delayed payment. As the turnover statute requires compensation only for the purchase price, as opposed to the fair market value, of the assets acquired by a third party from the judgment debtor, the turnover statute violates the "just compensation" requirement and is unconstitutional and inorganic.

## C.  We Need Not Address Genpro's Contracts Clause Claim

[37]    Genpro also challenges the turnover statute under the Contracts Clause of the Organic Act of Guam and Article I of the United States Constitution.  As we are resolving the case on other grounds, we need not reach this issue because it is "unnecessary to the resolution of the case." *Hemlani v. Hemlani*, 2015 Guam 16 ¶ 33.

## V.  CONCLUSION

[38]    First, we conclude we have jurisdiction and **DENY** WSTCO's Motion to Dismiss for Lack of Jurisdiction.  Second, because the turnover statute, 7 GCA §§ 23401-23406, is unconstitutional and inorganic, we **REVERSE** the judgment of the Superior Court and **REMAND** with directions to dismiss the special proceeding.


| /s/ | /s/ |
|:---:|:---:|
| KATHERINE A. MARAMAN | JOSEPH N. CAMACHO |
| Associate Justice | Justice *Pro Tempore* |


/s/
F. PHILIP CARBULLIDO
Chief Justice